**SPRING GARDEN UNITED NEIGHBORS, INC., Neftali Feliano, John Jamieson, Roland Vargas, on behalf of themselves and all others similarly situated**

v.

**CITY OF PHILADELPHIA; Gregore Sambor, individually and as Police Commissioner of the City; (first name unknown) Cruz, (first name unknown) Margolis and John Doe and Richard Roe, individually and as police officers of the City of Philadelphia.**

**Civ. A. No. 85–3209.**

United States District Court,
E.D. Pennsylvania.

June 12, 1985.

David Kairys, Kairys & Rudovsky, and Stefan Presser, American Civil Liberties Union/Foundation of Pa., Philadelphia, Pa., for plaintiffs.

Armando A. Pandola, Jr., Chief Deputy City Sol., Law Dept., City of Philadelphia, Philadelphia, Pa., for defendants.

NEWCOMER, District Judge.

BENCH OPINION

This is the case of Spring Garden United Neighbors, Inc., Neftali Feliano, John Jamieson, Roland Vargas, on behalf of themselves and all others similarly situated v. City of Philadelphia; Gregore Sambor, individually and as Police Commissioner of the

City of Philadelphia; (first name unknown) Cruz, (first name unknown) Margolis and John Doe and Richard Roe, individually and as police officers of the City of Philadelphia, Civil Action No. 85–3209. The Court issues the follow memorandum opinion from the bench.

In this civil rights action, filed on June 6, 1985, the plaintiffs, a Spring Garden community group organized to alleviate problems and improve community life in the Spring Garden area of Philadelphia as a result of the gentrification of the area, individual members and residents of Spring Garden, on their own behalf and on behalf of all others similarly situated, are presently before this Court seeking a preliminary injunction restraining the defendants from conducting unlawful stops, searches, detentions, arrests and assaults of persons of Puerto Rican ancestry in the Spring Garden area. For reasons which follow, this motion will be granted in accordance with the order accompanying this opinion. The following is issued as my findings of fact and conclusions of law, following a full hearing, arguments of counsel and a study of legal briefs submitted by both sides under Federal Rule of Civil Procedure 52.

On or about May 28, 1985, Officer Thomas Trench was killed by a gun and found in his police car at Spring Garden and 17th Streeets in Philadelphia. As a result of this lamentable and tragic incident, the police department began an investigation to find the person or persons who killed Officer Trench.

The evidence adduced by the plaintiffs at yesterday's hearing demonstrates that this police investigation included a persistent and ongoing practice of stopping, searching, detaining, frisking, handcuffing and questioning plaintiffs without any probable cause, reasonable suspicions or warrants. There were no charges levied against any of the plaintiffs who testified. This practice can only be described as a "sweep" of the Spring Garden neighborhood.

Most striking at the hearing was that all of the testimony presented by the plaintiffs was unrebutted and that the defendants' cross-examination of plaintiffs' witnesses left the testimony wholly intact.

The unrebutted evidence demonstrated a repeated, persistent pattern of unconstitutional stops, detentions, seizures and frisks, leading me to the inescapable conclusion that the police were conducting a "sweep" in their overzealous efforts to determine who had killed Officer Trench. These "sweeps" are documented for a one-week period, May 28, 1985 through June 5, 1985. Each witness who testified that he was subjected to the "sweep" encountered the same basic scenario. He was sitting or walking in the Spring Garden neighborhood when, without provocation or explanation, the police would handcuff him, frisk him, and take him away in a van or paddywagon to the Ninth District Precinct. There the subject would be kept from approximately two to ten hours, before being ultimately released.

All of those picked up were of Puerto Rican origin, none were charged with a crime at any time, none had any material information bearing on Officer Trench's death, and all were eventually released after a photograph and attached statement were taken. No explanation by the police officers was given when the persons were picked up, despite evidence that the persons often inquired as to the reason for police frisking, cuffing and detaining them. No requests were made for the individual voluntarily to come to the police headquarters, although nearly all testified that they would have.

No evidence was produced showing that any of the individuals had a prior police record, or even fitted a profile that was being investigated.

No evidence was introduced that records created as a result of the pictures and statements were expunged or that any official apology for the infringements on the Spring Garden residents has been forthcoming.

These "sweeps" affected the entire community. The witnesses who were picked up and detained ranged in age from 16

years to 65 years old. Evidence adduced at the hearing demonstrated that a minimum of 100 people were picked up and detained during the "sweep" of the Spring Garden neighborhood. A couple of instances were unbearably egregious:

Sixty-five-year-old Margarro Serrano was ordered out of his house at 9 a.m. on Monday, June 3, 1985, while cooking for himself and his invalid wife. The police officers refused to let him turn off the oven, inform his wife of his hasty departure, or even notify sons across the street that he was being taken to the police station. The officer assured Mr. Serrano that he would return in 15 to 20 minutes. Instead he was detained in a small room for approximately seven hours, during which time he was given no food and only one drink of water. As with the others who testified, no explanation was given and no charges brought against Mr. Serrano. Further, Mr. Serrano had no information on Officer Trench's death.

Plaintiffs' counsel argued that Mr. Serrano's detention was in retaliation for statements made by his son Raul against the police treatment of the Spring Garden residents resulting from the Trench investigation. Tellingly, the defendants conducted no cross-examination of Mr. Serrano.

On June 5, 1985, one day before this suit was filed, Jose Rosario was picked up by two detectives at 8:30 a.m. Mr. Rosario was walking with a bag of groceries, when he was picked up and he was forced to leave the bag on the sidewalk. He was cuffed, frisked and taken to the police station for two hours, questioned and released, after the police determined that he had no information on the Trench death.

During the investigation, City Councilman Angel L. Ortiz, also Chair of the Public Safety Committee, concerned about the rising tension between Spring Garden residents and the police department, and concerned about the mounting fears and frustrations of the Spring Garden residents resulting from the "sweep," spoke with Mayor Goode on May 30, 1985 and received the Mayor's assurance that if undue detentions and harassment were occurring, he would order the police to cease and desist.

A meeting between Mr. Ortiz and Deputy Police Commissioners Armstrong and Crudup the next day, May 31, 1985, resulted in similar reassurances and a walk through the Spring Garden "barrio" by Deputies Armstrong and Crudup, with Mr. Ortiz, to solidify their support and reassurance to the community, and to signal an end to the "sweeps."

Nonetheless, much to the dismay of Mr. Ortiz and Spring Garden residents, the "sweep" continued, as evidenced by the testimony, at least through June 5, 1985. Thus, these "sweeps" continued for at least one week after Officer Trench's death and for a substantial period of time after the community, through Councilman Ortiz, received assurances from Deputy Commissioners Crudup and Armstrong that these "sweeps" would cease immediately.

■ In order for the plaintiffs to sustain their burden of proof on the request for a preliminary injunction, the plaintiffs must show, first, a reasonable likelihood of success on the merits; and second, irreparable injury and the inadequacy of the legal remedies. In addition, I must consider and balance the equities involved: the possibility of harm to the defendants or the plaintiffs from the grant or denial of the injunctive relief sought, and the public interest. *Vine Street Concerned Citizens, Inc. v. Dole*, 604 F.Supp. 509, 512 (E.D.Pa.1985).

■ Here the plaintiffs have demonstrated a reasonable likelihood of success on the merits. They have demonstrated a pattern and practice of illegal stops, seizures, detentions and frisks aimed at Puerto Rican persons in the Spring Garden community. The policy or custom is reasonably inferred at this stage from the organization and extent of the "sweep" adduced by unrebutted testimony and from the testimony that the Mayor and the Deputy Police Commissioners had knowledge of and failed to halt the unlawful conduct.

I believe it reasonable to infer similar knowledge of Commissioner Sanbor at this

stage, given the clear understanding and apparent imprimatur by those directly above and below him. No evidence was offered that in any way suggested these were isolated instances by a few policemen, or that they occurred without official sanction, or that there were any reliable indicia to justify the "sweep" of the neighborhood. In fact, no evidence was offered to show that the police believed the suspect is of Puerto Rican origin or that he or she is from the Spring Garden neighborhood.

As to the next element, irreparable injury, the defendants strenuously argued that this case was moot, essentially because the Ninth District investigation has stopped and the inquiry has been switched to the Homicide Division of the Philadelphia Police Department.

From the testimony I conclude that any cessation of this "sweep" was either, one, a result of filing this suit; or two, a natural petering out, based on the police officers' completion of the "sweep," unrelated to any official command to stop. It appeared that the "sweep" was resulting in a waste of time and effort, since the residents either did not know anything, or were not cooperating as a result of the fear instilled by the "sweep."

In either event, the defendants alleged halt to these disgraceful activities does not render the request for a preliminary injunction moot.

> "It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants 'would be free to return to (their) old ways.'"

*Allee v. Medrano*, 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974) (cited cases omitted).

Under either the "possibility of recurrence" test, or the stronger standard suggested by the language of "substantial threat of future violations," plaintiffs have met their burden. First, the plaintiffs have shown a continuous and persistent pattern from May 28, 1985 through June 5, 1985.

Second, the City has, in recent history, conducted other "sweeps," notably a drug "sweep" known as "Operation Cold Turkey."

This Court, by Judge Van Artsdalen, entered a Consent Decree on April 11, 1985 ordering a halt to the use of impermissible "sweeps" by the City in designed "high crime" areas, for the purpose of reducing street narcotics activity. Yet, not even two months later, the City conducts another "sweep," albeit under different circumstances. Moreover here it is clear that the "sweep" is aimed at a specific neighborhood which is predominantly of Puerto Rican descent.

Apparently the City and the Philadelphia Police Department continue under the misapprehension that they can randomly "sweep" certain ethnic and racial groups with impunity, provided the goals sought are laudable in and of themselves. This "sweep," following closely on the heels of Operation Cold Turkey, makes it clear to me that the defendants would conduct a "sweep" again if they believed they could escape unscathed. To permit that would make a mockery of our constitutional right to be free from undue restraint in our daily lives, on the street, in front of our homes and inside our homes.

Moreover, the person or persons who killed Officer Trench have not been apprehended. There is no assurance that the "sweeps" are not still occurring and will not likely recur in the near future. On this point, once again, the lack of any evidence on behalf of defendants is disturbing. There was not even any evidence that an order was issued by anyone connected with the City government to halt the illegal practices.

The defendants claim that any injunction will impede their investigation by the Homicide Division. I believe that the argument, for which the defendants offered no evidence, is unpersuasive. The injunction will, of course, permit all lawful methods of investigation to continue in accordance with constitutional precepts.

Moreover, as plaintiffs recognize, determining who killed Officer Trench and apprehending that person or persons is critical to a restoration of peace in the community and to the easing of tensions between the police and Spring Garden residents, notwithstanding any court actions. It is actually in the interests of the police department to provide reassurance to the citizens of Spring Garden that law abiding citizens will not be randomly subjected to the unrestrained infringement of their constitutional rights in an effort to uncover who killed Officer Trench.

At the same time, issuance of the injunction is a sign to the Spring Garden community that their rights as citizens have meaning, and that they will be protected. The testimony revealed that residents fear walking in the neighborhood or sitting on steps in the neighborhood, believing they are continually subject to unexplained pick ups and detentions by the police.

The Fourth Circuit case of *Lankford v. Gelston*, 364 F.2d 197 (4th Cir.1966) is particularly instructive, insightful and applicable to the facts of this case, recognizing the importance of a preliminary injunction to the health of a community where there have been clear constitutional trespasses without any offer of apparent justification or reason to believe they will cease.

"The grave character of the department's conduct places a strong obligation on the court to make sure that similar conduct will not recur.

"It is of the highest importance to community morale that the courts shall give firm and effective reassurance, especially to those who feel they have been harassed by reason of their color or poverty.

"After so vast a demonstration of disregard of private rights, the complainants are entitled to a clear response. While the immediate pressure of wholesale raids has been withdrawn, the practice of indiscriminate searches of homes has been renounced only obliquely, if at all, and the danger of repetition has not been removed. The sense of impending

crisis in police-community relations persists, and nothing would so directly ameliorate it as a judicial decree forbidding the practices complained of." Id. at 203, 204.

Lankford was cited with approval in the Supreme Court case of *Rizzo v. Goode*, 423 U.S. 362, 373 Note 8, 96 S.Ct. 598, 605 note 8, 46 L.Ed.2d 561 (1976).

Here the situation is similar. The unrebutted testimony reveals that the police engaged in a pattern of persistent civil rights violations by "sweeping" the Spring Garden neighborhood in search of Officer Trench's killer. Tragic and lamentable as the killing was, the crisis is not an excuse or justification for the willful disregard of citizens' constitutional rights. There is no assurance that this will not recur in the future, and in fact, the history of this case and the recent "Operation Cold Turkey" case demonstrate the contrary position; namely, that the police and the City are willing to engage in the use of illegal "sweeps" in place of investigations in accordance with the Constitution.

Finally, issuing an injunction will serve to restore community confidence in the guarantees of protection of an individual's rights, without harming the police investigation.

I must remark in closing that this case sadly brought to mind a famous line from the well-known movie "Casablanca": "Major Strasser's been shot! ... Round up the usual suspects." However, in the movies the farce is humorous and draws chuckles. In this case, I believe the line is appropriate but devoid of any humor. I have therefore issued the following order:

AND NOW, this 12th day of June, 1985, after an evidentiary hearing on plaintiffs' motion for a preliminary injunction and consideration of the arguments presented by plaintiffs and defendants, it is hereby Ordered that plaintiffs' motion is GRANTED and defendants are enjoined as follows:

1. Police officers shall not stop, frisk, question, threaten, search the person or property of, detain, take into custody,

arrest or use physical force against any person in the Spring Garden community without meeting the requirements of the Constitution of the United States.

2. Police officers shall not take any of the actions itemized in paragraph one against any person based only on his Puerto Rican or Hispanic ancestry and/or his presence in the Spring Garden community.

3. Nothing in this order shall diminish or interfere with the authority of police officers to enforce the criminal laws; to make arrests, searches and inquiries; and to conduct investigations, as consistent with constitutional requirements.

4. Defendants shall take all steps necessary to see that this order is enforced, including informing all officers in the Ninth Police District of its existence and terms forthwith.

And it is so ordered.