**NATIONAL CONGRESS FOR PUERTO RICAN RIGHTS, by Richie Perez, National Coordinator; and Kelvin Daniels; Poseidon Baskin; Djibril Toure; Hector Rivera; Victor Rodriguez; and Kahil Shkymba, individually and on behalf of a class of all others similarly situated, Plaintiffs,**

v.

**The CITY OF NEW YORK; the New York City Police Department; and New York City Police Officers John Does # 1–500; Mayor Rudolph Giuliani; and New York City Police Commissioner Howard Safir, in their individual and official capacities, Defendants.**

No. 99 Civ. 1695(SAS).

United States District Court,
S.D. New York.

Oct. 20, 1999.

Nancy Chang, Center for Constitutional
Rights, New York City, Jonathan C.
Moore, New York City, Natalie R.

Williams, Jennifer Cowan, Debevoise & Plimpton, New York City, for Plaintiffs.

Lisa S.J. Yee, Assistant Corporation Counsel, Corporation Counsel for City of New York, New York City, for Defendants.

## OPINION & ORDER

SCHEINDLIN, District Judge.

Plaintiffs, a civil rights organization and six black and Latino men, bring this civil rights case under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and the Constitution and laws of the State of New York. In addition to money damages, they seek declaratory and injunctive relief for themselves and on behalf of a class of similarly situated individuals. Plaintiffs seek a judgment declaring the Street Crime Unit's ("SCU") practice and/or custom of suspicionless stops and frisks to be unconstitutional. Their request for injunctive relief is considerably broader.[1] Defendants the City of New York, Mayor Rudolph Giuliani, and Police Commissioner Howard Safir have moved to dismiss plaintiffs' equitable claims as well as their Equal Protection and conspiracy claims.[2] For the following reasons, defendants' motion is granted in part and denied in part.

## I. Background

This case involves alleged constitutional violations by a unit of the New York City Police Department (the "NYPD") known as the Street Crime Unit (the "SCU"). The SCU is an elite squad of police officers whose purported mission is to interdict violent crime in New York City and, in particular, remove illegal firearms from the streets. Amended Complaint ("Compl.") ¶ 38. It is alleged that SCU officers subject residents of high crime areas, particularly Black and Latino men, to stops and frisks based not on reasonable suspicion but on their race and national origin. *Id.* ¶ 39.

1. Plaintiffs seek to either enjoin the continued operation of the SCU or, in the alternative, an order:
 (1) enjoining the SCU from continuing its policy, practice and/or custom of suspicionless stops and frisks;
 (2) enjoining the SCU from continuing its policy, practice and/or custom of conducting stops and frisks based on racial and/or national origin profiling;
 (3) enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by SCU officers;
 (4) requiring the City, NYPD, Safir and Mayor Giuliani to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the SCU's policy, practice and/or custom of suspicionless stops and frisks;
 (5) requiring the City, NYPD, Safir and Giuliani to institute and implement more effective methods to screen applicants to the SCU, including the use of psychological testing and evaluations;
 (6) requiring the City, NYPD, Safir and Giuliani to deploy SCU teams with appropriate and adequate supervision;
 (7) requiring the City, NYPD, Safir and Giuliani to institute and implement appropriate measures to ensure compliance with departmental directives that SCU officers complete UF–250's on each and every stop and frisk they conduct;
 (8) requiring the City, NYPD, Safir and Giuliani to institute and implement appropriate measures to mandate that UF–250's or other documentation be prepared and maintained in a computerized database for each stop conducted by an SCU officer, regardless of whether the stop is followed by the use of force, a frisk, a search or an arrest; and
 (9) requiring the City, NYPD, Safir and Giuliani to monitor stop and frisk practices of the SCU, including periodically and regularly reviewing form UF–250's to determine whether reported stops and frisks have comported with constitutional requirements.
 *See* Amended Complaint, Wherefore Clause.

2. Not subject to dismissal are the compensatory and punitive damage claims of the individual plaintiffs for alleged violations of their Fourth Amendment rights.

The named individual plaintiffs are six Black and Latino men between the ages of 23 and 31 years old who reside in the boroughs of the Bronx and Brooklyn. *Id.* ¶¶ 12–17. Each plaintiff alleges that he has been stopped and frisked by police officers believed to be members of the SCU without reasonable suspicion and on the basis of his race and national origin. *Id.* ¶¶ 63–74. Each claims to have sustained injuries as a result of these encounters including fear of the possibility of future stops and frisks.[3]

Plaintiff National Congress for Puerto Rican Rights ("National Congress") is a membership organization opposed to discrimination against Puerto Ricans in the United States. Compl. ¶ 18. Since 1986, it has been fighting police brutality and racially-motivated violence. *Id.* It has received numerous complaints from its members and others regarding "suspicionless stops and frisks of young Puerto Rican males by New York City police officers." *Id.* ¶ 76. National Congress has alleged that it expends substantial resources at the city, state and national levels to advocate reforms to end police misconduct. *Id.* ¶ 77. National Congress is not suing in a representational capacity on behalf of its members but rather in its own right for injuries it allegedly sustained as a result of the SCU's activities.

## II. Discussion

### A. Motion to Dismiss Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, all factual allegations set forth in the complaint must be accepted as true and all reasonable inferences must be drawn in plaintiff's favor. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In deciding such a motion, a court "looks to the four corners of the complaint and evaluates the legal viability of the allegations contained therein." *Hoffman v. Empire Blue Cross and Blue Shield,* 96 Civ. 5448,

1999 WL 782518, at *1 (S.D.N.Y. Sept. 30, 1999) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991)).

A court should not dismiss a complaint unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Thus, the issue is not whether the plaintiff will prevail but whether it is entitled to offer evidence in support of its claims. *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citation omitted).

### B. Standing—Individual Plaintiffs—Constitutional Requirements

In order to invoke the jurisdiction of the federal courts, a party must "satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (citations omitted). Accordingly,

> [p]laintiffs must demonstrate a personal stake in the outcome in order to assure that concrete adverseness which sharpens the presentation of issues necessary for the proper resolution of constitutional questions. Abstract injury is not enough. The plaintiff must show that he sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.

*Id.* at 101–02, 103 S.Ct. 1660 (citations and internal quotations omitted). Specifically, a plaintiff must demonstrate that "(1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is

---

**3.** In fact, several of the plaintiffs have been stopped more than once. *See, e.g.,* Compl. ¶¶ 63, 64 & 66.

likely to redress the injury." *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir.1998) (citing *Northeastern Florida Contractors v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)). Moreover, "a plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Id.* (citing *Lyons*, 461 U.S. at 105–06, 103 S.Ct. 1660). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).[4]

■ Defendants contend that the present case is on "all fours" with *Lyons* which compels dismissal of plaintiffs' claims for injunctive and declaratory relief. In *Lyons*, the plaintiff had been placed in a chokehold without provocation or justification after being stopped for a minor traffic violation. 461 U.S. at 97, 103 S.Ct. 1660. Plaintiff sought injunctive relief barring the use of chokeholds alleging that police officers " 'pursuant to the authorization, instruction and encouragement of defendant City of Los Angeles, regularly and routinely apply these choke holds in innumerable situations where they are not threatened by the use of any deadly force whatsoever.' " *Id.* at 103, 103 S.Ct. 1660. The Court found plaintiff's assertion that he may again be subject to an illegal chokehold in the future to be too speculative and dismissed the case for lack of standing. *Id.* at 108–09, 103 S.Ct. 1660.

The Court found the likelihood of a future encounter with the police to be remote especially in light of the assumption that individuals will conduct their activities within the law. *Id.* at 103, 103 S.Ct. 1660 (citing *O'Shea*, 414 U.S. at 497, 94 S.Ct. 669, for the proposition that "respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners"). In order to have another encounter with the police, the plaintiff would have to be "arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury." *Id.* at 108, 103 S.Ct. 1660. Thus, for the plaintiff in *Lyons* to establish an actual controversy, he would not only have to allege that he would have another encounter with the police but he would have to make "the incredible assertion either, (1) that all police officers in Los Angeles always choke a citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 106, 103 S.Ct. 1660. Such a contention, the Court noted, was squarely refuted by the record which contained no evidence of "any written or oral pronouncement by the LAPD or any evidence showing a pattern of police behavior that would indicate that the official policy would permit the application of the control holds on a suspect that was not offering, or threatening to offer, physical resistance." *Id.* at 110, n. 9, 103 S.Ct. 1660. The Court further noted that in the time between plaintiff's encounter with the police and the filing of the complaint, there were no "further unfortunate encounters between Lyons and the police." *Id.* at 108, 103 S.Ct. 1660.

---

4. Plaintiffs meet this requirement as they have alleged that they were severely traumatized by the encounters with the SCU officers and that they "fear they could be stopped and frisked by SCU officers at any time simply because of their race and/or national origin." Compl. ¶ 75. Plaintiffs' alleged fear is augmented by the fact that future encounters remain a distinct possibility. *See Thomas v.*

*County of Los Angeles*, 978 F.2d 504, 507 (9th Cir.1992) ("Repeated instances of violence and retaliatory confrontations are 'continuing present adverse affects' and cause the threatened injury to be 'sufficiently real and immediate to show an existing controversy.' ") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

*Lyons* is distinguishable from the present case on a number of grounds. First, there is the difference in the number of alleged constitutional violations resulting from the challenged policies. In *Lyons*, in addition to himself, the plaintiff alleged in his first amended complaint that 10 chokehold-related deaths had occurred as a result of defendant's official policies. 461 U.S. at 100, 103 S.Ct. 1660. Here defendants' policy, evidenced by a pervasive pattern of unconstitutional stops and frisks, has allegedly affected tens of thousands of New York City residents, most of whom have been black and Latino men. Compl. ¶ 5. Courts have not been hesitant to grant standing to sue for injunctive relief where numerous constitutional violations have resulted from a policy of unconstitutional practices by law enforcement officers. *See, e.g., Allee v. Medrano*, 416 U.S. 802, 815, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (injunctive relief appropriate given a "persistent pattern of police misconduct" as manifested by a series of unconstitutional acts by police officers against union organizers); *Thomas v. County of Los Angeles*, 978 F.2d at 508 (realistic threat of future injury found where record indicated that in numerous instances the challenged police conduct was "condoned and tacitly authorized by department policy makers").

A second distinguishing factor is that here at least three of the named individual plaintiffs claim they have been victimed by these unconstitutional practices repeatedly. *See* Compl. ¶¶ 63, 64, 66, 69 & 70. As plaintiffs' allegations must be accepted as true for purposes of this motion, *see Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), this alone establishes that plaintiffs face a realistic threat of future harm.[5] *See Nicacio v. United States I.N.S.*, 797 F.2d 700, 702 (9th Cir.1985) (the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented"). Unlike the situation presented

in *Lyons*, here there is no chain of contingencies making the threat of future harm speculative. This is especially true in light of the fact that, unlike the plaintiff in *Lyons*, plaintiffs do not have to break the law to be exposed to the alleged constitutional violations. The fact that plaintiffs were stopped while engaging in everyday tasks further illustrates a realistic risk of future harm. Courts have distinguished *Lyons* and found standing where innocent individuals are victims of unconstitutional police conduct. *See, e.g., Thomas*, 978 F.2d at 508 (plaintiffs had standing to sue for injunctive relief because in contrast to *Lyons*, "many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment"); *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985) (court found standing where class members were subjected to constitutional injury based on completely innocent behavior).

If in fact this case is on "all fours" with any case, it is with *Thomas*, not *Lyons*. In *Thomas*, the plaintiffs were predominately black and Latino residents of the City of Lynwood, California. 978 F.2d at 505. They alleged that deputy sheriffs in Lynwood used excessive force in detaining minority citizens and employed unlawful procedures in searching the home of minority residents. *Id.* at 506. The Ninth Circuit found that "[r]epeated instances of violence and retaliatory confrontations are 'continuing present adverse affects' and cause the threatened injury to be 'sufficently real and immediate to show an existing controversy.'" *Id.* at 507 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). The court went on to distinguish *Lyons* as follows:

> The Court held that Lyons, one citizen in a very large city, could not credibly allege that he would again be detained by the police and again be the victim of

---

5. *Cf. Curtis v. City of New Haven*, 726 F.2d 65, 68 (2d Cir.1984), where the court held that plaintiffs lacked standing to seek injunction against use of mace by city police department

where its use had not been authorized pursuant to city policy and there was no showing that plaintiffs were likely to again suffer mace assault.

a police chokehold. In contrast, the record before this court indicates that numerous instances of police misconduct have occurred in a small six by seven block area, some minority residents of the area have been mistreated by deputies more than once, and many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment. Moreover, plaintiffs have alleged that the misconduct is purposefully aimed at minorities and that such misconduct was condoned and tacitly authorized by department policy makers. We conclude that the plaintiffs have alleged a "real and immediate threat of injury" and consequently have presented a justiciable controversy.

*Id.* at 507–08 (quoting *Lyons,* 461 U.S. at 103, 103 S.Ct. 1660). Given the similarities between *Thomas* and the present case, plaintiffs have adequately alleged a real and immediate threat of future injury and have thus satisfied the Article III "case or controversy" requirement.

## C. Standing—Individual Plaintiffs—Prudential Concerns

■ In addition to the constitutional standing requirements imposed by Article III, courts must consider the prudential requirements of standing developed by the Supreme Court as a form of judicial "self-restraint." *See Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). In deciding whether to exercise self-restraint, a court must examine: (1) whether the plaintiff is asserting his or her own legal rights and interests, as opposed to those of a third party, and (2) whether the harm asserted is a particularized grievance, not a generalized concern shared by a large class of people. *Etuk v. Slattery,* 936 F.2d 1433, 1440 (2d Cir.1991) (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

Here, prudential concerns do not favor dismissal as plaintiffs are asserting their own legal rights to be free from unreasonable searches and seizures. Moreover, although racial and national origin discrimination is a generalized concern to many, plaintiffs' complaint of suspicionless stops by the SCU is sufficiently particularized. Accordingly, this Court need not refrain from deciding the case because of prudential concerns.

## D. Injunctive Relief and Equitable Restraint

■ It is a basic maxim that courts of equity should not act when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. *O'Shea,* 414 U.S. at 499, 94 S.Ct. 669 (citing *Younger v. Harris,* 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). Additionally, "recognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws in the absence of a showing of irreparable injury which is 'both great and immediate' " *O'Shea,* 414 U.S. at 499, 94 S.Ct. 669 (quoting *Younger,* 401 U.S. at 46, 91 S.Ct. 746). "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' " *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (quoting *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951)).

Defendants argue that the principles espoused in the cases of *O'Shea, Rizzo* and *Lyons* counsel in favor of restraint in the instant action. In *O'Shea,* the plaintiffs alleged that the state criminal laws and procedures were deliberately applied more harshly to black persons in the city of Cairo, Illinois. 414 U.S. at 490, 94 S.Ct. 669. These practices included illegal bond-setting, sentencing and jury-fee practices. *Id.* at 495, 94 S.Ct. 669. The Court found injunctive relief to be inappropriate as it would be an "abrasive and unmanageable intercession" in the normal course of

criminal proceedings. *Id.* at 504, 94 S.Ct. 669. The Court noted that the equitable relief requested "would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class." *Id.* at 501, 94 S.Ct. 669. "[S]uch a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which [the] Court has recognized in the decisions previously noted." *Id.* at 502, 94 S.Ct. 669.

The Supreme Court expanded the principles of *O'Shea* in the case of *Rizzo,* where minority residents of Philadelphia alleged unconstitutional police mistreatment by a small number of city policemen. 423 U.S. at 366–67, 96 S.Ct. 598. The Court declined to grant equitable relief citing principles of federalism and the "well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Id.* at 378–79, 96 S.Ct. 598 (quoting *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). In *Rizzo,* the injunctive order would not have interrupted ongoing criminal proceedings as in *O'Shea* but would have significantly revised the internal procedures of the Philadelphia police department. *Id.* at 379, 96 S.Ct. 598. Regarding federalism and principles of equity, the Court stated:

> even where the prayer for injunctive relief does not seek to enjoin the state criminal proceedings themselves, we have held that the principles of equity nonetheless militate heavily against the grant of an injunction except in the most extraordinary circumstances . . .
>
> Thus the principles of federalism which play such an important part in governing the relationship between federal courts and state governments, thought initially expounded and perhaps entitled to their greatest weight in cases where

it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments such as petitioners here.

*Id.* at 379–80, 96 S.Ct. 598.

These principles were again applied by the majority in *Lyons,* albeit in a somewhat cursory fashion. It is Justice Thurgood Marshall's dissent, however, that proves most interesting. Justice Marshall characterized the equitable relief sought in *Lyons* as follows:

> Unlike the permanent injunction at issue in *Rizzo,* the preliminary injunction involved here entails no federal supervision of the LAPD's activities. The preliminary injunction merely forbids the use of chokeholds absent the threat of deadly force, permitting their continued use where such a threat does not exist. This limited ban takes the form of a preventive injunction, which has traditionally been regarded as the least intrusive form of equitable relief.

461 U.S. at 133, 103 S.Ct. 1660. According to Justice Marshall, the modest equitable relief granted in *Lyons* differs markedly from the intrusive injunction involved in *Rizzo* and does not implicate the same federalism concerns. *Id.* at 133–34, 103 S.Ct. 1660.

Of greater significance is Justice Marshall's concern over the possible preclusion of appropriate relief. "The federal practice has been to reserve consideration of the appropriate relief until after a determination of the merits, not to foreclose certain forms of relief by a ruling on the pleadings." *Id.* at 130, 103 S.Ct. 1660. With regard to the possible foreclosure of equitable relief, Justice Marshall wrote:

> A court has broad discretion to grant appropriate equitable relief to protect a

party who has been injured by unlawful conduct, as well as members of the class, from future injury that may occur if the wrongdoer is permitted to continue his unlawful actions. Where, as here, a plaintiff alleges both past injury and a risk of future injury and presents a concededly substantial claim that a defendant is implementing an unlawful policy, it will rarely be easy to decide with any certainty at the outset of a lawsuit that no equitable relief would be appropriate under any conceivable facts that he might establish in support of his claim. *Id.* at 131, 103 S.Ct. 1660.

Given the early stage of this litigation, I decline to put the proverbial cart before the horse and prematurely foreclose the granting of any equitable relief whatsoever. This result is consistent with that reached in other cases. *See, e.g., Allee,* 416 U.S. at 814, 94 S.Ct. 2191 (injunction prohibiting Texas Rangers form using their authority to arrest, stop, disperse or imprison plaintiffs without "adequate cause"—injunction upheld where it "does no more than require the police to abide by constitutional requirements"); *Thomas,* 978 F.2d at 508–09 ("A state law enforcement agency may be enjoined from committing constitutional violations where there is proof that officers within the agency have engaged in a persistent pattern of misconduct" supported by a fully defined record); *Build of Buffalo, Inc. v. Sedita,* 441 F.2d 284, 289 (2d Cir.1971) ("Deliberate, purposeful activity resulting in widespread police abuses and perhaps rising to the level of de facto policy were held to be an appropriate occasion for injunctive relief in cases such as" *Lankford v. Gelston,* 364 F.2d 197 (4th Cir.1966), and *Schnell v. City of Chicago,* 407 F.2d 1084 (7th Cir. 1969)); *Spring Garden United Neighbors, Inc. v. City of Philadelphia,* 614 F.Supp. 1350, 1351 (E.D.Pa.1985) (court granted preliminary injunction restraining police department from conducting unlawful stops, searches, detentions, arrests and assaults of persons of Puerto Rican heritage in the Spring Garden area of Philadelphia).

Here, the individual plaintiffs meet the Article III case or controversy requirements. Furthermore, neither prudential standing concerns nor principles of equitable restraint require dismissal at this stage of the litigation. Accordingly, the individual plaintiffs may proceed with their equitable claims.

### E. National Congress' Standing

Plaintiffs concede that National Congress is not suing in a representative capacity on behalf of its members. *See League of Women Voters of Nassau County v. Nassau County Bd. of Supervisors,* 737 F.2d 155, 160 (2d Cir.1984) (League did not have standing to assert the rights of its members). Rather, it is suing in its own right for alleged injuries it has sustained as a result of the alleged unconstitutional practices of the SCU. In particular, National Congress, an organization engaged in advocacy for the civil rights of Puerto Ricans in the United States, has had to divert substantial financial and other resources to advocate for reforms which would put an end to the SCU's constitutional abuses. As long as these abuses continue, National Congress' resources will continue to be depleted.

It is well-established that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). This type of abstract concern was present in the case of *Calvin v. Conlisk,* 534 F.2d 1251 (7th Cir.1976), where the Seventh Circuit denied standing to an organization.

The organizations' other alleged basis for standing, viz., that they will incur expenses in processing claims of police misconduct unless the federal equity court intervenes, assuming this amounts to injury in fact, is not within the zone of interests protected by the Fourteenth Amendment. Moreover, to allow standing on this basis would be to circumvent

principles which the Supreme Court has carefully delineated and observed. It would leave nothing of the limitations imposed by the Court in *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It would also give an organization with a particularized interest the right to bring suit in order to spare itself the expense of continued efforts to further that interest ... An organization devoted to the defense of cases it believed to infringe civil liberties, could facially attack any statute touching on civil liberties in order to avoid the future expense of defending cases brought under the law.

*Id.* at 1253 (internal citations and footnote omitted).[6]

This reasoning is persuasive. Moreover, cases such as *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir.1993), where organizational standing was conferred, appear to be distinguishable. In *Havens Realty*, the plaintiff organization provided counseling and referral services for low- and moderate-income home buyers. 455 U.S. at 379, 102 S.Ct. 1114. Plaintiff alleged that defendants' discriminatory steering practices perceptibly impaired the organization's ability to provide these services. The Court found "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* (citing *Sierra Club*, 405 U.S. at 737, 92 S.Ct. 1361). Similarly, in *Ragin*, the plaintiff organization also provided counseling and referral services. 6 F.3d at 905. The Second Circuit granted standing, noting that the organization was "forced to 'devote significant resources to identify and counteract' the defendants' advertising practices and did so to the detriment of their 'efforts to [obtain] equal access to housing through counseling and other referral services.'" *Id.* (quoting *Havens Realty*, 455 U.S. at 379, 102 S.Ct. 1114).

Here there are no allegations that National Congress provides referrals, or any other type of services, in its efforts to combat discrimination. Nor does it reimburse the litigation expenses of its members who bring anti-discrimination suits. National Congress' interest in ending the unconstitutional practices of the SCU is a generalized concern related to its abstract social interest in eliminating discrimination against Puerto Ricans. Accordingly, the consequent drain on its resources in achieving this end does not present the type of traceable and redressable injury necessary to confer standing. The claims of National Congress are therefore dismissed.

### F. Primary Jurisdiction

The doctrine of primary jurisdiction has been defined as "a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Primary jurisdiction thus "applies where a claim is originally cognizable in the court, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within

---

**6.** In *Sierra Club,* the Supreme Court held that in the absence of any allegation that a membership corporation or its members would be affected in any of their activities or pastimes by a proposed ski resort and recreation area in a national game refuge and forest, the corporation, which claimed a special interest in conservation of natural game refuges and forests, lacked standing under the Administrative Procedure Act to maintain an action for injunctive and declaratory judgment that the proposed development would contravene federal laws. 405 U.S. at 740, 92 S.Ct. 1361 (a mere interest in a problem is not sufficient to render the organization adversely affected or aggrieved).

the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–59 (2d Cir.1994). Primary jurisdiction serves two interests: "consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions of fact through the agency's specialized expertise, prior to judicial consideration of the legal claims." *Id.* at 59. In short, "courts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency." *National Comm. Assoc., Inc. v. American Tel. and Tel. Co.*, 46 F.3d 220, 223 (2d Cir.1995) (citation omitted).

 There is, however, no fixed formula to be applied in determining whether an agency has primary jurisdiction. *Id.* (citing *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). The following four factors are relevant:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings;

(4) whether a prior application to the agency has been made.

*Id.* at 222. The court must also balance the advantages of applying primary jurisdiction against the costs associated with complications and delay in the administrative proceedings. *Id.* at 223.

 Defendants argue that primary jurisdiction should apply to stay plaintiffs' equitable claims pending resolution of investigations commenced by the U.S. Department of Justice and the New York State Attorney General. Application of the above factors, however, leads to a different result. As this is a civil rights case, factors one and two do not apply. *See Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 737 (3rd Cir.1983) (primary jurisdiction does not apply to claims for declaratory and injunctive relief based on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, as well as 42 U.S.C. §§ 1981 and 1983). The third factor, the danger of inconsistent rulings, is not a concern here. The statutory authority under which the federal investigations are proceeding is 42 U.S.C. § 14141 which makes it illegal for law enforcement officers to engage in a pattern or practice of conduct that deprives persons of their constitutional rights. Enforcement of the statute is entrusted to the Attorney General of the United States who may proceed in a civil action to "obtain appropriate equitable and declaratory relief to eliminate the pattern or practice." 42 U.S.C. § 14141(b). The Justice Department's strategy has been one of negotiation with resort to litigation only when efforts at conciliatory resolution fail. *See* Miller, Note, 17 Yale L. & Pol'y Rev. 149, 186–87 (1998) This lawsuit will not interfere with such conciliatory efforts. Whatever progress the Justice Department or New York State Attorney General make without litigation will surely be welcomed by plaintiffs. Moreover, if their efforts at conciliation fail and either agency commences a civil suit, principles of *res judicata* and collateral estoppel will ensure consistency in any legal rulings. With regard to the fourth factor, the agency investigations, though underway, do not appear to be near completion.[7] Accordingly, this factor

---

7. This Court invited the United States Attorneys for the Southern and Eastern Districts to apprise it of the progress of its investigations. *See* Letter of September 21, 1999 to Mary Jo White, Esq. and Loretta Lynch, Esq. These agencies were assured that their statements would be reviewed *in camera* and placed under seal. Nonetheless, the responses were peculiarly general and non-informative. Based on the information provided, I cannot properly assess the progress of these investigations.

also does not favor a stay on grounds of primary jurisdiction.

In sum, because this is a civil rights case involving claims of a constitutional dimension, the U.S. Department of Justice and the New York State Attorney General are no better suited to decide the relevant issues than this Court. I therefore decline to apply the doctrine of primary jurisdiction and stay this action. *Cf. Knight v. James,* 514 F.Supp. 567 (M.D.Ala.1981) (stay applied to complex problem of *de jure* system of segregated public higher education where Department of Education was engaged in good faith negotiations to resolve all the problems before the court).

### G. Equal Protection

■■■■■ To establish a *prima facie* violation of the Equal Protection Clause, plaintiffs must show that the challenged conduct had a discriminatory effect and was motivated by a discriminatory purpose. *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). There must be proof that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980). In a race case, this means that plaintiffs must show that similarly situated individuals of a different race were not subjected to the challenged conduct. *Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480. Because plaintiffs failed to do this, their Equal Protection claim is fatally defective.

Plaintiffs' attempt to bypass the usual equal protection standards by characterizing this case as a "selective violation" case, rather than a selective prosecution case, is unavailing. In *Chavez v. Illinois State Police,* 27 F.Supp.2d 1053 (N.D.Ill.1998), a case not controlling on this Court but nonetheless instructive, the court found *Armstrong* applicable on very similar facts. In *Chavez,* the plaintiffs alleged that the Illinois State Police "stop, detain and search African–American and Hispanic motorists solely on the basis of their race." *Id.* at 1060. The court rejected plaintiffs' attempt to distinguish *Armstrong* on the ground that a prosecutor's decision as to whom to charge is different from a state trooper's decision as to whom to stop.

Regardless of the degree of judicial deference given to either decision, the central inquiry in each case is whether any plaintiff was treated differently than a similarly situated person of a different race. The answer to this question lies not in the deference given to the decision-maker in the respective situations, but in whether the decision(s) made resulted in impermissible treatment of similarly situated persons. Accordingly, the plaintiffs' attempt to distinguish *Armstrong* based on the fact that a state trooper, as opposed to a prosecutor, decided which motorist to stop must fail. *Id.* at 1067.

Thus, plaintiffs' contention that they need not identify similarly situated white individuals who were not stopped and frisked by the SCU must fail. Plaintiffs would not meet this requirement even if they alleged that only black and Hispanic residents were subjected to suspicionless stops. *See Armstrong,* 517 U.S. at 470, 116 S.Ct. 1480 (statistical evidence showing that all defendants prosecuted during a certain year were black fails to satisfy similarly situated requirement—the study "failed to identify individuals who were not black and could have been prosecuted for the offense for which respondents were charged, but were not so prosecuted"). Without a showing of different treatment of similarly situated persons, either through statistical or other evidence, plaintiffs' Equal Protection claim is dismissed.

However, pursuant to Fed.R.Civ.P. 15(a), leave to amend a complaint "shall be freely given when justice so requires." *See also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("It

is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citations omitted). Accordingly, plaintiffs may serve and file an amended complaint within twenty days from the date of this Opinion and Order, if they can allege facts sufficient to support a claim of a violation of their rights to equal protection of the laws.

## H. Conspiracy

Plaintiffs have alleged that the defendants conspired with each other to deprive them of their rights under the Fourth and Fourteenth Amendments. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973) (quoting *Neff v. World Publ'g Co.*, 349 F.2d 235, 257 (8th Cir.1965)).

> An essential element in a claim of conspiracy to deprive a plaintiff of his constitutional rights is an agreement to do so among the alleged co-conspirators. Without such a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy. The plaintiff must allege facts showing that the defendants shared a "unity of purpose or common design" to injure the plaintiff. Where the complaint makes only conclusory allegations of a conspiracy ... and fails to allege facts suggesting an agreement or meeting of the minds among the defendants, the court may properly dismiss the complaint.

*Sales v. Murray*, 862 F.Supp. 1511, 1517 (W.D.Va.1994) (citations omitted). In addition, the conspiracy must be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir.1993).

In order to survive a motion to dismiss, a § 1983 conspiracy complaint must contain more than mere conclusory allegations. *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993) (citations omitted). "Diffuse and expansive allegations are insufficient unless amplified by specific instances of misconduct." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977). Thus, where a conspiracy claim is conclusory and fails to allege facts which suggest an agreement among the parties, the complaint must be dismissed. *See Woodrum v. Woodward County, Okl.*, 866 F.2d 1121 (9th Cir.1989).

Here, the complaint is devoid of any allegations suggesting an agreement on the part of defendants. The fact that the SCU officers may have been following an unconstitutional policy allegedly "devised, implemented, enforced and sanctioned" by the City of New York, Safir and Giuliani is not evidence that the defendants tacitly agreed among themselves to deprive plaintiffs of their constitutional rights. Moreover, the plaintiffs' allegations are conclusory. *See* Compl. ¶ 91 (overt acts consisted of John Does 1–500 having stopped and frisked members of the plaintiff class without reasonable suspicion). Because a meeting of the minds has not been alleged, plaintiffs' conspiracy claim is dismissed as to all defendants. *See Murdaugh Volkswagen Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073 (4th Cir.1981) (the wrongful acts of two or more persons do not amount to a conspiracy).

Plaintiffs' conspiracy claim can be dismissed on an alternative ground. In addition to the conclusory, vague and general allegations that the defendants have engaged in a conspiracy, all of the alleged co-conspirators are employees of the City of New York and, except for Giuliani, are members of the New York City Police Department. "Where the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand." *Burrell v. City University of*

*New York,* 995 F.Supp. 398, 414 (S.D.N.Y. 1998) (citing *Everston v. State of New York Mortgage Agency,* 89 Civ. 7474, 1992 WL 6190, at *6 (S.D.N.Y. Jan. 3, 1992) (conspiracy claim failed as a matter of law where all of the individual defendants were employees of SONYMA at the time of the alleged conspiracy)). *See also Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 542 (2d Cir.1993) (unilateral conduct on the part of a single enterprise falls outside the purview of § 1 of the Sherman Act, prohibiting conspiracies in restraint of trade); *Ritzie v. City University of New York,* 703 F.Supp. 271, 277 (S.D.N.Y.1989) (conspiracy requires participation by an external party). Thus, at least as to John Does 1–500 and Safir, there can be no claim of conspiracy as they are all employees of the New York City Police Department.

Because I find that plaintiffs cannot allege any facts sufficient to support a conspiracy claim, such claim is dismissed without leave to amend. *See Cortec Indus.,* 949 F.2d at 48 (leave to amend should not be granted where amendment would be futile).

## III. Conclusion

For the reasons set forth above, plaintiffs' claims for declaratory and injunctive relief will neither be dismissed nor stayed. National Congress, however, is dismissed as a plaintiff to this action. In addition, plaintiffs' Equal Protection and conspiracy claims are likewise dismissed, the former subject to leave to amend within 20 days of this Opinion and Order. A conference in this case is scheduled for November 1, 1999 at 4:30 p.m.