**Duncan P. MacISSAC, Jr., Plaintiff,**

v.

**TOWN OF POUGHKEEPSIE, John O'Rourke, Dattell Honkala, Craig Meisel, Jason Guy, and Edward Kolor, Police Officers sued in their individual capacities, Defendants.**

**No. 09 CIV 02828–WGY.**

United States District Court, S.D. New York.

March 9, 2011.

Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiff.

David Lewis Posner, McCabe & Mack LLP, Poughkeepsie, NY, for Defendants.

## Memorandum and Order

WILLIAM G. YOUNG, District Judge.[1]

### I. INTRODUCTION

It is said that hard cases make bad law. This is a hard case. The plaintiff, Duncan P. MacIssac, Jr. ("MacIssac"), alleges that he was subject to the use of excessive force by five police officers, John O'Rourke, Dattell Honkala, Craig Meisel, Jason Guy, and Edward Kolor (collectively "the Officers"), who were employed by the Town of Poughkeepsie ("the Town") and acting under color of state law. MacIssac seeks compensatory and punitive damages as against the Officers, compensatory damages and injunctive relief as against the Town, and attorneys' fees and costs under 42 U.S.C. §§ 1983, 1988. The Town now moves for dismissal of MacIssac's claim for an injunction on the ground that he lacks standing to sue for such equitable relief under *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), and its progeny.

### A. Alleged Facts

MacIssac is a resident of the City of Poughkeepsie.[2] Compl. ¶ 1, ECF No. 1. The Town is a municipal corporation organized pursuant to the laws of the State of New York. *Id.* ¶ 3. The Officers were employees of the Town on March 1, 2008. *Id.* ¶ 4.

On that date, MacIssac was operating his vehicle on a public highway in the Town. *Id.* ¶ 8. The Officers, wearing their police uniforms and operating police cruisers, stopped MacIssac's vehicle and arrested him on suspicion of driving while intoxicated ("DWI").[3] *Id.* ¶¶ 5, 9–10, MacIssac admits that both the stop and the arrest

---

1. Of the District of Massachusetts, sitting by designation.

2. Upon MacIssac's request, the Court takes judicial notice of the adjudicative fact that the City of Poughkeepsie is contiguous to the Town. Fed.R.Evid. 201(b); *see* Mem. Law Opp'n Def.'s Mot. Partial Dismissal ("Pl.'s Mem.") 7, ECF No. 21.

3. The Court takes judicial notice that MacIssac pled guilty to the DWI charge, a copy of his guilty plea having been provided by the Town. Reply Mem. Supp. Def.'s Mot. Partial Dismissal ("Def.'s Reply") 2, ECF No. 17–7; Def.'s Ex. C, ECF No. 17–6. This is a matter "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid.

were undertaken with "arguable probable cause." *Id.* ¶¶ 9–10.

While in police custody, but before he was handcuffed, MacIssac informed the Officers that he had back surgery scheduled for the following week and that he was suffering from low blood sugar. *Id.* ¶ 11(a).[4] He contends that, after he was handcuffed, the Officers used a Taser stun gun on him three times; bent his back, arms, and legs in a manner that caused significant pain; and otherwise used excessive force beyond that needed to control him. *Id.* ¶ 11(b). He denies that he was resisting arrest, *Id.* ¶¶ 11(b)–12. The individual officers who did not directly apply excessive force to him watched and observed the conduct of their fellow officers without taking any affirmative step to prevent or stop it. *Id.* ¶ 13. The Officers' treatment of MacIssac was captured on a videotape with intermittent audio. *Id.* ¶ 15.

MacIssac claims that the Officers' excessive use of force against him was directly caused by the Town's failure adequately to train and supervise its police officers, including the five named defendants in this case. *Id.* ¶¶ 16–18. After the incident, MacIssac filed a complaint with the Town, but alleges that the Town neither disciplined the Officers nor retrained them in light of his complaint. *Id.* ¶¶ 14–15.

### B. Procedural History

On March 24, 2009, MacIssac filed a civil complaint against the Town and the Officers, alleging that the excessive use of force by the Officers and the Town's policies, practices, and customs (specifically its failure to train, supervise, and discipline its

police officers) violated his rights under the Fourth Amendment, made actionable by Section 1983. *Id.* ¶¶ 22–23. MacIssac claims that the Officers' conduct caused him to suffer significant pain, physical and mental injuries, anxiety, and a diminution in the enjoyment of life. *Id.* ¶ 20. In his prayer for relief, he seeks, in addition to compensatory and punitive damages, to "enjoin the defendant Town from failing to train, supervise and discipline its police officers and appoint a Master to supervise the proper implementation of constitutionally requisite practices." *Id.* at 5. In essence, he asks this Court to order the Town to instruct its police officers not to use Taser stun guns when making otherwise peaceful stops and arrests.

On October 23, 2009, the Town filed a motion and supporting memorandum of law to dismiss only MacIssac's claim for injunctive relief for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Def.'s Mot. Partial Dismissal, ECF No. 17; Mem. Law Supp. Def.'s Mot. Partial Dismissal ("Def.'s Mem."), ECF No. 17–5. MacIssac responded with a memorandum of law opposing the Town's motion, dated November 9, 2009. Pl.'s Mem. On November 19, 2009, the Town filed a reply memorandum of law in support of its motion. Def.'s Reply. The case was reassigned to this Court on July 29, 2010.

### C. Federal Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, as this case arises under 42 U.S.C. §§ 1983, 1988.

---

201(b)(2); *Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir.2005); *Rios v. Third Precinct Bay Shore*, No. 06–CV–4641, 2009 WL 2601303, at *1 & n. 2 (E.D.N.Y. Aug. 20, 2009).

4. MacIssac's complaint contains two paragraphs numbered 11. For clarity's sake, there are referred to herein as ¶ 11(a) and ¶ 11(b).

## II. ANALYSIS

### A. The Motion to Dismiss

■■■ A motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is an appropriate mechanism for challenging a plaintiff's constitutional standing to bring a particular claim. *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 104 (2d Cir.2008); *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n. 3 (2d Cir.1999). "[s]tanding ... is intended to be a threshold issue at least tentatively decided at the outset of the litigation." *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir.2009); *see Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir.2008) ("Standing is 'the threshold question in every federal case, determining the power of the court to entertain the suit.'" (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006))).

■■■ "Because 'standing is challenged on the basis of the pleadings, [the Court must] accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 114 (2d Cir.2002) (quoting *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir.1998)) (other internal quotation marks omitted); *see Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "[A]t the pleading stage, standing allegations need not be crafted with precise detail," *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F.Supp.2d 568, 581 (S.D.N.Y.2010) (quoting *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir.2003)) (internal quotation marks omitted), yet the plaintiff's "[s]tanding for an equitable claim must appear on the face of the complaint in order to survive a motion to dismiss." *Aiken v. Nixon*, 236 F.Supp.2d 211, 221 (N.D.N.Y.2002) (citing *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

### B. Standing to Seek Injunctive Relief

■■■ To meet the "case-or-controversy" requirement of Article III, a plaintiff must establish that he has standing to bring suit. *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Standing, broadly speaking, requires a plaintiff to demonstrate a "personal stake in the outcome of the litigation." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543–44, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). Formulated as a three-part test, a plaintiff must show that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

■■■ The third prong of this test—redressability—has been interpreted to mean that a plaintiff's standing depends on the form of relief requested. *See Friends of the Earth*, 528 U.S. at 185, 120 S.Ct. 693 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.")In seeking prospective relief like an injunction, a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such judicial decree. *Lyons,*

461 U.S. at 102–05, 103 S.Ct. 1660 (collecting cases). Past injury alone does not establish a present case or controversy for injunctive relief, *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. 669; *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998). Rather, "the injury alleged must be capable of being redressed through injunctive relief 'at that moment.'" *Robidoux v. Celani,* 987 F.2d 931, 938 (2d Cir.1993) (quoting *County of Riverside v. McLaughlin,* 500 U.S. 44, 51, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991)).

In *Lyons,* the seminal case on the issue of equitable standing, the plaintiff, Adolph Lyons, claimed that, during a traffic stop and without provocation or justification, Los Angeles police officers put him into a chokehold, which caused him to lose consciousness and suffer injury to his larynx. 461 U.S. at 97–98, 103 S.Ct. 1660. He sought injunctive relief against the City of Los Angeles to prevent its police squad from using chokeholds except where officers were reasonably threatened with the immediate use of deadly force. *Id.* at 98, 103 S.Ct. 1660. Despite Lyons's allegation that he justifiably feared being choked again, given the extensive use of chokeholds by the Los Angeles police, *id.,* the Supreme Court held that the risk that he himself would come into contact with the police and suffer a subsequent unlawful chokehold was speculative in nature and insufficient to confer equitable standing, *id.* at 109, 103 S.Ct. 1660. For injunctive relief, "Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, ... or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105–06, 103 S.Ct. 1660.

Lyons, in fact, had alleged that the City of Los Angeles provided "authorization, instruction and encouragement" for the use of chokeholds, such that they were "regularly and routinely" applied by officers "in innumerable situations" where no deadly force was threatened. *Id.* at 98, 103 S.Ct. 1660. The Supreme Court concluded, however, that this allegation was "not equivalent to the unbelievable assertion that the City either orders or authorizes application of the chokeholds where there is no resistance or other provocation." *Id.* at 106 n. 7, 103 S.Ct. 1660. Even accepting as true that the city authorized the use of chokeholds in some instances not necessarily involving deadly force, such as a suspect resisting arrest, the Court found too farfetched "the possibility that [Lyons himself] would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation." *Id.* at 106, 103 S.Ct. 1660; *see also Curtis v. City of New Haven,* 726 F.2d 65, 68 (2d Cir.1984) (finding "no showing" that the plaintiffs were likely to be stopped by New Haven police officers and, for no reason, assaulted with mace again in violation of the City's General Orders). So long as he cooperated fully if stopped again, there was nothing to "indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy," *Lyons,* 461 U.S. at 106, 103 S.Ct. 1660. Lyons would have had to allege that the City approved the use of chokeholds in every situation, without any regard for the conduct of the person being stopped or arrested; without this allegation, he lacked equitable standing.

As scholars have lamented for years, the restriction that *Lyons* places on the availability of injunctive relief in Sec-

tion 1983 cases is significant.[5] Less attention has been given, however, to the way in which *Lyons* requires a more stringent showing by the plaintiff for standing to *seek* equitable relief than *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), requires for the same plaintiff to *receive* that relief. Put another way, factual allegations that, if proven, may entitle a plaintiff to an injunction under *Monell* fall short of what that same plaintiff must plead simply to have her request for injunctive relief heard on the merits under *Lyons*. This Court discerns two reasons for this incongruous result.

First, under *Lyons* and its progeny, "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir.2004). An official policy sanctioning the illegality is required for a plaintiff to have equitable standing, but this by itself is not enough if there exists no reasonable likelihood that the plaintiff, in going about his everyday activities, will be affected by the implementation of that policy in the future. *Id.* at 214, 216 (concluding that the plaintiff,

who had received a declaratory judgment that the official policy at issue was unconstitutional, nevertheless lacked equitable standing because he failed to demonstrate a likelihood of future harm). In contrast, an official policy theoretically is sufficient to enjoin the unconstitutional acts of a municipality and its officers under *Monell*.

In *Monell*, the Supreme Court held that a municipality is liable "under § 1983 for monetary, declaratory, or *injunctive relief* where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. 2018 (emphasis added). Thus, from its inception, municipality liability under *Monell* has extended to equitable relief. The Supreme Court, in its recent decision in *Los Angeles Cnty. v. Humphries*, —— U.S. ——, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010), reaffirmed that "*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective." *Id.* at 453–54. The Supreme Court explained that a municipality may face liability only for its own policies

---

**5.** The oft-repeated criticism of *Lyons* is that damages awards, in contrast to equitable relief, are inadequate to prevent the government from further engaging in civil rights abuses. *See, e.g.*, Kami Chavis Simmons, *The Politics of Policing: Ensuring Stakeholder Collaboration in the Federal Reform of Local Law Enforcement Agencies*, 98 J. Crim. L. & Criminology 489, 499–500 (2008) (stating that "some critics believe 'civil remedies are never a sufficient form of accountability because they almost never address flawed management, policies, or patterns of abuse, nor do they hold an individual officer financially responsible'" (quoting Allyson Collins, Human Rights Watch, *Shielded from Justice: Police Accountability in the United States* 77 (1998))); John C. Jeffries, Jr. & George A. Rutherglen, *Structural Reform Revisited*, 95 Cal. L. Rev. 1387, 1418 (2007) ("[I]t seems clear that damages

actions are not a generally effective remedy against abusive and excessive use of force by law enforcement."); Laura L. Little, *It's About Time: Unraveling Standing and Equitable Ripeness*, 41 Buff. L. Rev. 933, 948–49 (1993) ("Injunctions not only prevent suffering, but also avoid the difficult task of reconstructing with money damages the position the plaintiff would have been in but for the defendant's wrongful conduct. . . . The *Lyons* formula, however, blunts this potential by severely limiting the availability of injunctive relief."); *cf.* Alan K. Chen, *Rosy Pictures and Renegade Officials: The Slow Death of Monroe v. Pape*, 78 UMKC L. Rev. 889, 923 (2010) (arguing that, after *Lyons*, claims under Section 1983 for "damages are . . . important not only at the individual level, but also may be the only practical way to address systemic harm as well").

or customs that result in constitutional injury, and whether an act or omission can be attributed to a municipality does not depend on the form of relief sought. *Id.* at 453.

▆▆ Logically then, equitable relief ought be available in a Section 1983 case, if the court deems it appropriate, on the same record on which damages are available. Because a plaintiff must prove an official policy to hold a municipality liable for any and all forms of relief, and because the relief requested has no bearing on what constitutes an official policy, then proof of an official policy ought entitle the plaintiff to whatever relief the court considers appropriate. So long as the plaintiff has proved municipal liability under *Monell,* it is within the power and discretion of the court to remedy the constitutional deprivation by awarding monetary damages or equitable relief or both, depending on its assessment of what the particularities of the case require. *See* Richard D. Freer, Federal Practice & Procedure § 3573.2 (3d ed. 2010) ("[Section 1983] allows relief 'in an action at law, suit in equity, or other proper proceeding for redress.' This permits the federal courts to use any available remedy to make good the wrong suffered."); *see also Lyons,* 461 U.S. at 131, 103 S.Ct. 1660 (Marshall, J., dissenting) ("A court has broad discretion to grant appropriate equitable relief to protect a party who has been injured by unlawful conduct ... from future injury that may occur if the wrongdoer is permitted to continue his unlawful actions"); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944))).

Ironically, this view—now seemingly endorsed by the Supreme Court in *Humphries*—was first expressed by the four dissenting justices in *Lyons.* The *Lyons* dissenters flatly rejected the notion that a court could have jurisdiction to adjudicate a request for damages but not for injunctive relief, where both depended on a demonstration that an official policy was unconstitutional. *Lyons,* 461 U.S. at 114, 103 S.Ct. 1660 (Marshall, J., dissenting). They clamored against the majority's decision to "fragment[ ] a single claim into multiple claims for particular types of relief." *Id.* at 122, 103 S.Ct. 1660. Now, twenty-seven years later, an unanimous Supreme Court similarly has rejected a "relief-based bifurcation" of the logic of *Monell. Humphries,* 131 S.Ct. at 453. While nothing in *Humphries* suggests an intention to retreat from the holding of *Lyons,* which does bifurcate standing to bring a *Monell* claim on the basis of the relief sought, how the two are to be squared remains to be seen.

▆▆ The second reason that it is, in effect, easier to obtain relief under *Monell* than it is to have standing under *Lyons* is that *Lyons* defines its "official policy" requirement in a significantly more limited way than the courts have interpreted this same requirement under *Monell.* Both standing under *Lyons* and municipal liability under *Monell* require an official policy sanctioning the unconstitutional conduct at issue. But a policy sufficient to hold a municipality liable may be too "unofficial" to give the plaintiff standing to sue for equitable relief in the first place.

▆▆ Under *Monell,* an official policy need not be explicit; it also need not be an affirmative act. For instance, a municipality's failure to train its officers may constitute a "policy" actionable under Section 1983 where (1) "the failure to train amounts to deliberate indifference to the

rights of persons with whom the police come into contact," and (2) there is a causal link between the "identified deficiency in a city's training program" and the constitutional injury suffered.[6] *City of Canton v. Harris,* 489 U.S. 378, 388, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *Monell's* reach, therefore, goes beyond unconstitutional policies that have been formally endorsed by the municipality and includes instances in which a municipality's knowledge of and support for its officers' unconstitutional conduct can be inferred from its failure to curtail that conduct. *See, e.g., Dorsett–Felicelli, Inc. v. County of Clinton,* 371 F.Supp.2d 183, 194 (N.D.N.Y. 2005) (describing the four theories of *Monell* liability, only one of which involves "a formal policy officially endorsed by the municipality").

In contrast, a close reading of *Lyons* indicates that only if Lyons had made "the unbelievable assertion that the City either orders or authorizes application of the chokeholds where there is no resistance or other provocation" would he have had equitable standing. 461 U.S. at 106 n. 7, 103 S.Ct. 1660. This is a much narrower definition of an "official policy," but one to which the courts of the Second Circuit have adhered when determining whether a particular plaintiff may seek injunctive relief. Noting that *Lyons* compelled its conclusion, the Second Circuit in *Curtis* discerned no official policy that would justify enjoining the City of New Haven and its police officers from using mace except in certain specified circumstances. 726 F.2d at 65. The court acknowledged the district court judge's finding that the New Haven Police Department's General Orders were "deficient in significant re-

spects," *Id.* at 66. Still, these deficiencies did not rise to the level of express authorization for the coercive, offensive, and unprovoked use of mace—which is what, in the Second Circuit's view, was required by *Lyons. Id.* at 68; *see also Deshawn E.,* 156 F.3d at 344–45; *Spinner v. City of N.Y.,* No. 01–CV–2715, 2003 WL 23648356, at *6 (E.D.N.Y. Oct. 10, 2003); *Dodge v. County of Orange,* 208 F.R.D. 79, 84–85 (S.D.N.Y.2002); *Lake v. Speziale,* 580 F.Supp. 1318, 1328 (D.Conn.1984); *cf. Baur,* 352 F.3d at 640 n. 14. As such, the plaintiffs in *Curtis* lacked standing to seek injunctive relief, even though separate juries, in awarding them damages, appeared to have concluded the officers acted unconstitutionally. 726 F.2d at 68. Considering this precedent, allegations that, if proven, would constitute an official policy for liability under *Monell* cannot be assumed to constitute the same for standing under *Lyons.*

In sum, "*Lyons* ha[s] effectively rendered injunctive relief against police misconduct virtually unobtainable, even where the misconduct involves patterns of abuse or unconstitutional official policies" that would entitle a plaintiff to relief under *Monell* and, more recently, *Humphries.* Marshall Miller, Note, *Police Brutality,* 17 Yale L. & Pol'y Rev. 149, 159–60 (1998); *see also Cadiz v. Kruger,* No. 06–CV–5463, 2007 WL 4293976, at *10 n. 9 (N.D.Ill. Nov. 29, 2007) ("We are mindful ... that some plaintiffs may seek not only monetary damages on a *Monell* claim, but also may seek injunctive relief against specific police practices.... However, in the typical excessive force case that would give rise to an accompanying *Monell* claim, a plaintiff would lack standing to seek pro-

**6.** A failure to train (as well a failure to supervise and discipline) is the ground on which MacIssac asks this Court to hold the Town liable. Compl. ¶¶ 15–18. The Court express-

es no view as to whether MacIssac's allegations are sufficient to state a claim for relief under *Monell.*

spective injunctive relief for a past event that (as to that plaintiff) has no foreseeable likelihood of recurring."). This is because, one, *Lyons* requires plaintiffs to plead more facts for standing on the front end than *Monell* requires them to prove for municipal liability on the back end, and, two, an "official policy" that satisfies *Monell* will not necessarily satisfy *Lyons*. ·

■ But what of it? The incongruous result of *Lyons* that an equitable claim on which *Monell* liability properly could be found will fail virtually every time for lack of standing suggests to this Court that the issue of justiciability ought remain separate from the appropriateness of a particular remedy. Certainly, a necessary element of standing is redressability—that is, "it must be likely, not merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotation marks omitted). A favorable decision on justiciability, however, ought not be read to necessitate any particular form of relief. At the pleading stage, a showing of redressability is made where the alleged dispute is "presented ... in a form historically viewed as capable of judicial resolution." *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). "Satisfaction of this requirement ensures that the lawsuit does not entail the issuance of an advisory opinion without the possibility of judicial relief, and that the exercise of a court's remedial powers will actually redress the alleged injury." *Lyons*, 461 U.S. at 129, 103 S.Ct. 1660 (Marshall, J., dissenting). So long as this is true, a plaintiff ought be entitled to her day in court. Yet *Lyons*, by requiring that a complaint demonstrate not that some form of judicial relief is capable of redressing the plaintiff's alleged injury but rather that injunctive relief is the appropriate and necessary redress, effectively denies litigants the op-

portunity to be heard on the merits and denies federal courts their power to remedy constitutional harms as they see fit. *See* Richard H. Fallon, Jr., *Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons,* 59 N.Y.U. L. Rev. 1, 7 (1984) ("[*Lyons* ] forecloses a federal court from obtaining pertinent information about the lawfulness of the defendant's conduct and from balancing the various interests, before deciding whether relief ought to be provided.").

■ The point is not that injunctive relief ought be available to more litigants in more cases. Courts, careful not to exceed their constitutional authority, must be wary of ordering equitable relief in Section 1983 cases where the practical effect of such judicial decree is the structural reformation of a local law enforcement agency. *See* John Choon Yoo, *Who Measures the Chancellor's Foot? The Inherent Remedial Authority of the Federal Courts,* 84 Cal. L. Rev. 1121, 1123 (1996) ("[T]he Constitution does not permit the federal courts to exercise their remedial powers to engage in the structural reform of local institutions and local government,"). Nor is the point that injunctive relief ought always be available where damages are appropriate. On the contrary, a plaintiff seeking an injunction still must demonstrate "a likelihood of irreparable harm if the requested relief is denied." *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir. 2007). This remains a difficult standard to meet—and rightfully so, for it is the rare case where no adequate remedy at law exists, But whether a plaintiff has met the "likelihood of irreparable harm" standard for injunctive relief should be decided by the court *after* the parties have developed a factual record. "Only after the facts have unfolded can a court intelligently weigh the potential threat of harm in light of other factors bearing on whether an

injunction is the most effective and appropriate remedy." Little, *supra* at 937. On a developed record/ the failure to demonstrate a likelihood of irreparable harm, or a "real and immediate threat of injury" as *Lyons* termed it, should be a remedial barrier, but not a jurisdictional one.

 This Court does not disagree with the well-established principle that standing is a threshold question, and that if, on the face of the complaint, the plaintiff has failed to allege facts sufficient to support standing, a court may not proceed to entertain the underlying request for relief. *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir.2005) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1993)). Arguably, a plaintiff whose complaint the defendant moves to dismiss for lack of standing is no more disadvantaged than the typical plaintiff facing a motion to dismiss under Rule 12(b)(1). Standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice" for standing purposes. *Id.* "In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R.Civ.P. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.* A plaintiff actually may benefit from having the issue of standing decided at the outset, where it is the sufficiency of the jurisdictional facts alleged, not the facts themselves, being tested and

where presumptive truthfulness attaches to those jurisdictional allegations. *See Tasini v. New York Times Co., Inc.*, 184 F.Supp.2d 350, 353 (S.D.N.Y.2002); *see also Whitmore v. Arkansas*, 495 U.S. 149, 159, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (noting that a plaintiff's complaint may allege "a specific and perceptible harm sufficient to survive a motion to dismiss for lack of standing," but that the defendant nonetheless may be "entitled to summary judgment on the standing issue if it show[s] that the allegations were sham and raised no genuine issue of fact" (internal quotation marks omitted)).

 But *Lyons* teaches otherwise where equitable relief is at issue. If Adolph Lyons's complaint, which alleged both an unconstitutional official policy and a reasonable fear that he himself would face the application of that policy again, was insufficient to confer equitable standing under the overly heightened and particularized pleading requirements imposed by the Supreme Court, then few complaints seeking injunctive relief ever will survive a motion to dismiss for lack of subject-matter jurisdiction. Standing ought be evaluated at the outset of the litigation, and continually thereafter by the court sua sponte, *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *Central States Se. & Sw. Areas Health & Welfare Fund*, 433 F.3d at 198, but evaluation of a complaint under the *Lyons* standard, when the plaintiff has had no opportunity to develop a factual record demonstrating the appropriateness of injunctive relief, forces a court to make a remedial decision before the litigation truly has begun. This is ill-timed and unfair to those plaintiffs for whom discovery or trial would have unearthed the appropriateness of injunctive

relief.[7] *See* Little, *supra* at 947–48 (citing *Lyons*, 461 U.S. at 131, 103 S.Ct. 1660 (Marshall, J., dissenting)).

The Supreme Court clearly desires this state of affairs. As this Court has commented before, "the Supreme Court was well aware that its decision in *Lyons* might have [the] consequence" of "forbid[ding] courts from enjoining egregious institutional conduct" that would otherwise give rise to *Monell* liability, but "the majority was not moved by these obvious ramifications of its analysis." *Blake v. Southcoast Health Sys., Inc.*, 145 F.Supp.2d 126, 133–34 (D.Mass.2001). In short, none of this is new. Although the Supreme Court's recent holding in *Humphries* that the elements necessary to state a *Monell* claim do not vary with the form of relief requested seems curiously at odds with *Lyons*'s relief-based bifurcation of standing, *Humphries* does not purport to alter or soften the blow of *Lyons*. In fact, *Humphries* makes no mention of *Lyons*. *Lyons* thus remains controlling law on the issue of equitable standing, and this Court is bound to follow it and its "harsh practical results." Little, *supra* at 936.

■ Turning now to the present case, MacIssac seeks to enjoin the Town's police officers from using Taser stun guns when making otherwise peaceful arrests. He lacks standing to bring this claim under *Lyons*, however, because he has failed to allege facts demonstrating with any credibility that he himself will suffer the same injury again, As an initial matter, MacIssac has not alleged in the complaint that

7. A plaintiff's ability to seek redress for a violation of her constitutional rights is further limited by the doctrine of qualified immunity. Just as *Lyons* imposes a high threshold burden on claimants seeking injunctive relief, qualified immunity imposes a similarly high threshold burden on claimants seeking damages for constitutional violations. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (establishing modern qualified immunity doctrine). Like the *Lyons* standing inquiry, qualified immunity analysis takes place early in the litigation, as it is meant to shield public officials not only from liability for damages but also from the costs of trial and discovery. *See Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) ("[B]ecause '[t]he entitlement [to qualified immunity] is an *immunity from suit* rather than a mere defense to liability,' we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985))). Thus, regardless of the remedy sought, any plaintiff alleging a violation of her constitutional rights must overcome significant hurdles at the pleading stage before even gaining access to the judicial fact-finding apparatus.

In addition to curtailing the factual inquiry into constitutional violations, both *Lyons* and qualified immunity limit judicial elaboration of the contours of constitutional rights. Most claims for injunctive relief under Section 1983 will fail the *Lyons* standing inquiry long before a court has a chance to address the substance of the constitutional right at issue. Likewise, since the Supreme Court's recent decision in *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), courts confronted with qualified immunity may consider whether a claimed constitutional right was clearly established at the time of the defendant's alleged misconduct before deciding whether a violation of that right occurred. *Id.* at 818 (overturning the mandate of *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that courts determine whether a constitutional right has been violated before addressing whether that right was clearly established). As a result of these two doctrines, countless constitutional claims are adjudicated without addressing the actual constitutional right at issue. *Cf. Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (stating that the mandatory two-step approach to qualified immunity was important to the "law's elaboration from case to case"); John C. Jeffries, Jr., *Reversing the Order of Battle in Constitutional Torts*, 2009 Sup. Ct. Rev. 115, 131–33 (2009) (discussing "the underenforcement of constitutional rights" in light of *Lyons*, *Monell*, and now *Pearson* ). .

he will have another encounter with the Town's police. *See Lyons,* 461 U.S. at 105, 103 S.Ct. 1660; *Curtis,* 726 F.2d at 68. In responding to the Town's motion for partial dismissal, MacIssac argues that "an act as mundane as driving in the Town of Poughkeepsie, an everyday occurrence, brings [him] into contact with poorly trained and supervised Town of Poughkeepsie police officers, employed by a Town indifferent to his constitutional rights." Pl.'s Mem. 11. But he ignores the fact that he was stopped not for innocently driving his vehicle but on suspicion of DWI, an offense to which he later pled guilty. This distinguishes his case from those in which the plaintiffs had standing to sue for injunctive relief in part because their likelihood of suffering the same harm again did not depend on them willfully breaking the law. *See Bray v. City of N.Y.,* 346 F.Supp.2d 480, 487 n. 1 (S.D.N.Y.2004); *Roe v. City of N.Y.,* 151 F.Supp.2d 495, 503 (S.D.N.Y.2001); *National Congress for P.R. Rights v. City of N.Y.,* 75 F.Supp.2d 154, 161 (S.D.N.Y. 1999); *Weiser v. Koch,* 632 F.Supp. 1369, 1373–74 (S.D.N.Y.1986); *Lake v. Speziale,* 580 F.Supp. at 1327–28; *see also* Jeffries & Rutherglen, *supra,* at 1420 ("The lower courts have limited *Lyons* to cases in which the plaintiff's own misconduct led to the disputed police action.").

More importantly, even assuming that MacIssac faces a realistic threat of being stopped on suspicion of DWI again, nothing in the complaint suggests a reasonable likelihood that, during such a stop and possible arrest, the Town's officers again will use a Taser stun gun. As the Supreme Court in *Lyons* held, a claim by MacIssac that the Town's officers always use such excessive force on anyone who is stopped or arrested, regardless of that person's conduct in response to the stop or arrest, would be "untenable," and he does not make this "incredible assertion." 461

U.S. at 106, 108, 103 S.Ct. 1660. Rather, MacIssac alleges that the Town's failure to train and supervise its officers caused his injury and that the Town's failure to discipline the individual defendants in this case after he filed a complaint demonstrates its condonement of conduct in violation of his constitutional rights. Whether these allegations, if proven, would give rise to municipal liability under *Monell* is irrelevant because they do not confer standing to sue for injunctive relief under *Lyons.* See *Curtis,* 726 F.2d at 68. The alleged failures to train, supervise, and discipline fall short of what *Lyons* requires for equitable standing in this case: that is, an official policy that Taser stun guns were to be used in every stop and arrest, without regard to whether the suspect resisted arrest or otherwise provoked the use of force. Moreover, even such a policy might not suffice here, given how speculative it is that MacIssac will be stopped, arrested, and subjected to the use of a Taser stun gun yet again. *Lyons,* 461 U.S. at 106 n. 7, 103 S.Ct. 1660. Thus, taking all the allegations in his complaint as true, MacIssac has not established an actual case or controversy with respect to his claim for an injunction.

### III. CONCLUSION

Because, under *Lyons,* MacIssac lacks standing to seek an injunction against the Town, the Court must **ALLOW** the Town's motion under Federal Rule of Civil Procedure 12(b)(1) for dismissal of his claim for equitable relief, Judgment on this claim shall enter for the Town.

**SO ORDERED.**