Willian BARBOZA, Plaintiff,

v.

Steven D'AGATA, et al., Defendants.

13 Civ. 4067 CS

United States District Court, S.D. New York.

White Plains, N.Y., September 10, 2015, 10:00 a.m.

Bergstein & Ullrich, Attorney for Plaintiff Stephen Bergstein.

New York Civil Liberties Union, Attorney for Plaintiff Mariko Hirose, Jordan Wells.

Drake, Loeb, Heller, Kennedy, Gögerty, Gaba & Rodd, Attorney for Defendants Village of Liberty, Steven D'Agata and Melvin Gorr: Adam Lawrence Rodd.

Office of the Sullivan County Attorney, Attorney for Defendant Robert Zangla: Samuel Yasgur.

### DECISION

CATHY SEIBEL, District Judge

I have summary judgment motions from the Village of Liberty, Steven D'Agata and Melvin Gorr, who I will refer to as the village defendants, and from defendant Zangla. And I have a cross-motion for summary judgment from the plaintiff.

The following facts are based on the parties' 56.1 statements and the supporting materials and are undisputed except as noted.

Plaintiff is a resident of Bethel, Connecticut. On May 4, 2012 he was issued a speeding ticket while driving in Liberty, New York. On June 3, 2012 he pleaded guilty to a speeding violation by mail. He later received a form from the Town of Liberty Justice Court accepting the guilty plea and providing instructions for paying the fine. Plaintiff returned the payment form with his credit card information. At the top of the payment form, however, plaintiff crossed out the word Liberty in Liberty Town Court and replaced it with tyranny. And he also wrote in all caps and underlined across the top middle section of the form the following: Fuck your shitty town bitches. Upon receiving the plaintiff's form the town of Liberty Justice Court clerk brought it to the attention of Town Judge Brian Rourke. At the time all the court clerks were women. The clerk who delivered the form to Judge Rourke indicated that she and the other clerks were upset and alarmed by it. Judge Rourke believed that the phrase "fuck your shitty town bitches" might be a threat to those women and he referred the form to defendant Zangla, an assistant district attorney@ for Sullivan County, to determinesee if the communications constituted a crime. Zangla took the form back to his office and showed it to fellow assistant district attorney Meagan Galligan. Zangla left the form in Galligan's office and when he saw it next the form had the words "ag harassment" written on it in the handwriting of Sullivan County District Attorney James Farrell. Zangla commented to Galligan that he too determined that aggravated harassment was the appropriate charge. Zangla came to that conclusion only by reviewing the aggravated harassment statute. He did not speak to the clerk who opened the envelope containing plaintiff's form or otherwise con-

duct an investigation. He later discussed the matter with Farrell who agreed that the words written by plaintiff fit the charge of aggravated harassment. Zangla and Farrell discussed the fact that plaintiff might have a First Amendment defense to the charge but Farrell instructed Zangla to file the charge.

Judge Rourke wrote to plaintiff on September 26, 2012 advising plaintiff that plaintiff's payment for the speeding ticket would not be accepted and ordering plaintiff to appear in court on October 18, 2012. Zangla planned to file the aggravated harassment charge when plaintiff appeared in court. Zangla understood that upon the filing of the charge plaintiff would be arrested and processed. And since that's going to be important I'm going to specify where I get that from. I get that from Zangala's deposition at pages 34, 42 to 43 and 65, and plaintiff's 56.1 statement paragraph 26. I assume somebody is going to be ordering this transcript for Mr. Yasgur because he's going to need it.

On October 18, 2012 Detective Steven D'Agata was providing police security service at the Town of Liberty Justice Court. Once plaintiff entered the courtroom, Zangla showed D'Agata plaintiff's comments on the payment form and told D'Agata that the court clerks felt threatened by it and worried for their safety because of it. Zangla instructed D'Agata to draft and file an information charging plaintiff with aggravated harassment in the second degree under New York Penal Law 240.31(a). Plaintiff asserts that Zangla instructed D'Agata to file the information, whereas the village defendants say Zangla only asked D'Agata to do so. The difference is not material.

D'Agata drafted an information charging plaintiff with aggravated harassment in the second degrees and gave a copy to Zangla who reviewed and approved it.

D'Agata asked Officer Melvin Gorr to assist him in arresting the plaintiff. When plaintiff's case was called, Zangla handed the information to Judge Rourke, Judge Rourke reprimanded plaintiff for the comments on the form, handed plaintiff the information and informed plaintiff that he would be arrested. D'Agata and Gorr then handcuffed plaintiff and took him to the Village of Liberty Police Department for processing.

The criminal charge against plaintiff was ultimately dismissed as violative of plaintiff's First Amendment rights.

Arrests under Section 240.30 are common in the village and village officers frequently face situations where they are making an arrest because of the use of vulgar words in what may be perceived as a threatening context. Between 2003 and 2012, the Liberty Police Department made 63 arrests under Section 240.30(1)(a). There is actually a discrepancy in the number of arrests between the parties. I count 62 but the difference is not material. These arrests include those of people who used profanity, made crude sexual accusations and comments, and made intimidating threats. The department also made nine arrests between 2003 and 2009 under 240.30 without specifying the subsection.

From 2000 to the date of plaintiff's arrest the village did not provide training to its officers concerning Section 240.30(1) or on the First Amendment limitations of arrests for speech or written expression. Similarly, neither the Village of Liberty Police Department general rules of conduct nor the Liberty Police Department rules and regulations and manual of procedure contain guidelines about arresting people under 240.30 or for abusive expression. The village has no requirement to insure its officers are trained on the First Amendment. The village seemed to rely in this respect on the Police Academy

training that officers are required to obtain before being hired, but takes no steps to freshen its officers' understanding as the law develops. The village police department does not maintain hard copies or an electronic database of caselaw when making arrests. They rely on the black letter law found in the penal code.

· Scott Kinne, the officer in charge of the Liberty Police Department since the end of 2011 and the chief of police at the time of plaintiff's arrest testified that he was not aware of any cases limiting the application of Section 240.30(1), any court rulings interpreting the law, or any First Amendment problems arising from the law. D'Agata also testified that he was unaware of any court rulings interpreting the statute. Kinne expects his officers to take directions from the District Attorney's Office on legal questions.

It's a motion for summary judgment and the familiar standards under Rule 45 apply. I won't take the time to repeat them; we're all familiar with them.

I'm going to start with qualified immunity. An official sued under Section 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Plumhoff v. Rickard,* —— U.S. ——, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056. "In deciding questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first prong asks whether the facts taken in the light most favorable to the party asserting the injury showed the officer's conduct violated a federal right; and the second prong asks whether the right in question was clearly established at the time of the violation." *Respardo v. Carlone,* 770 F.3d 97, 113. Under prong two, a government official's conduct violates clearly established law when at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Abrams v. Department of Public Safety,* 764 F.3d 244, 255. To determine whether the relevant law was clearly established, we considered the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law. *Terebesi v. Torreso,* 764 F.3d 217, 231. Although courts in this Circuit generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by the Second Circuit or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established, so long as preexisting law clearly foreshadows a particular ruling on the issue. *Garcia v. Does,* 779 F.3d 84, 92.

In this Circuit, even if the right was clearly established, an officer is entitled to qualified immunity if it was objectively reasonable for the officer to believe the conduct at issue was lawful. *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154. Ordinarily, determining whether official conduct was objectively reasonable requires examination of the information possessed by the officials at that time without consideration of subjective intent. *Connecticut ex rel. Blumenthal v. Crotty,* 346 F.3d 84, 106.

The objectively reasonable standard is not without controversy, as other judges in the Circuit have described objective reasonableness as part of the clearly established inquiry rather than a separate prong. See Judge Straub's dissenting opinion in *Taravella v. Town of Wolcott,* 599 F.3d 129, 137 where he criticizes the

majority for describing a two-step analysis and yet relying on an extraneous third step. Also see *Okin v. Village of Cornwall–on–Hudson Police Department*, 577 F.3d 415, 433 note 11 and *Walczyk v. Rio*, 496 F.3d 139, 166.

Notwithstanding these criticisms, the Second Circuit has continued to find the object reasonableness inquiry as separate from that of clearly established law and I am bound by those decisions. See for example, *Coggins v. Buonora*, 776 F.3d 108, 114, and *Gardner v. Murphy*, 613 Fed.Appx. 40, 41 from June 2 of this year.

■ Turning first to Detective D'Agata and Officer Gorr. Plaintiff argues that they violated his right to be free from arrest without probable cause and his right to be free from arrest in retaliation for writing "fuck your shitty town bitches" on a parking ticket which he asserts is protected speech. I find, unsurprisingly, that defendants violated plaintiff's First Amendment rights when they arrested him under New York Penal Law Section 240.30(1) which was held unconstitutional by the New York Court of Appeals in 2014. See *Amore v. Novarro*, 624 F.3d 522, 532, where the Circuit said an arrest under a statute that has been authoritatively held to be unconstitutional is ordinarily a constitutional violation. Speech is often provocative and challenging ... but it is nevertheless protected against censorship or punishment unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest. *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398. Restraints on speech on the basis of its content except in a few limited categories are generally disallowed. *Hobbs v. County of Westchester*, 397 F.3d 133, 148. To be criminalized threatening speech must rise to the level of so-called fighting words,

those personally abusive epithets which when addressed to the ordinary citizen are as a matter of common knowledge inherently likely to provoke a violent reaction. *Williams v. Town of Greenburgh*, 535 F.3d 71, 77. Fighting words must tend to incite an immediate breach of the speech. *Posr v. Court Officer Shield 207*, 180 F.3d 409, 415. A state may also ban speech that constitutes "true threats" which encompasses those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535. The words at issue here are not inherently likely to provoke violent reaction, they were not directed at anyone in particular, and could not be interpreted as threatening any particular action. See *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 where the court said that while the four-letter word displayed by the defendant is not uncommonly employed in a personally provocative fashion, in this instance it was not clearly directed to the person of the hearer. Further, the words don't rise to the level of fighting words, and in any event because they were mailed, they did not suggest imminent action. See *Posr*, 180 F.3d at 416 where the Court noted that the phrase "one day you're going to get yours" was not fighting words in part because it was directed to a time other than the immediate and carried several plausible meanings that would not involve the threat of violence.

For these reasons I do find the defendant's First Amendment rights were violated and defendants do not seem to seriously contest that plaintiff suffered a constitutional violation. That's the first prong of the qualified immunity test.

I also find that plaintiff's right not to be arrested for the expression at issue was clearly established. In the complaint, plaintiff appears to proceed on both facial and as applied challenges to 240.30(1), although in his brief he states that his claim does not rest on the facial invalidity of the statute. I will in any event address both theories.

It was not clearly established at the time of plaintiff's arrest that 240.30(1) was facially invalid. Although the statute had previously been strictly construed to reach only conduct intended to threaten or harass, such as specific threats and intolerable invasions of privacy. *People vs. Rodriguez*, 19 Misc.3d 830, 833, 860 N.Y.S.2d 859, New York City Criminal Court, 2008, citing *People vs. Smith*, 89 Misc.2d 789, 791, 392 N.Y.S.2d 968, Second Department 1977. The Second Circuit noted in *Vives v. City of New York*, 405 F.3d 115, 118 that at least as of 2002, far from being so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws, several courts have specifically declined to find Section 240.30(1) unconstitutional. That's *Vives*, at 118, . Since then, other courts have declined to hold the statute unconstitutional. See *Adebiyi v. City of New York*, 2014 WL 4922888, page 6, where the court said at the time of plaintiff's arrest in 2012, as in *Vives*, the section was not sufficiently facially unconstitutional so as to place the defendant on notice. *People v. Dimuzio*, 7 Misc.3d 134(A), 801 N.Y.S.2d 239, Appellate Term 2015; finding that section neither unconstitutional on its face or as applied where the defendant told the complainant that he engaged in certain sexual acts with the plaintiff's wife. See also *People v. Little*, 14 Misc.3d 70, 830 N.Y.S.2d 428, Appellate Term 2006, where the court said although some have questioned the constitutionality of 240.30, neither the Second Circuit nor the

Court of Appeals has held the statute unconstitutional. And the statute was not held constitutional until 2014, see *People v. Golb*, 23 N.Y.3d 455, 991 N.Y.S.2d 792, 15 N.E.3d 805, 814 from the New York Court of Appeals, cert. denied —— U.S. ——, 135 S.Ct. 1009, 190 L.Ed.2d 839. So the officers could not have been expected to know that the statute was unconstitutional on its face. It was clearly established, however, at the time of plaintiff's arrest that Section 240.30(1) could not be applied to expressions like the one at issue here, which though crude and offensive to some, did not convey an imminent threat and was made in the context of complaining about government activity. In *People v. Mangano*, 100 N.Y.2d 569, 570, 764 N.Y.S.2d 379, 796 N.E.2d 470, the New York Court of Appeals in 2003 upheld an as applied challenge to section 240.30(1) where the defendant left five voice messages on the Village of Ossining Parking Violations Bureau's answering machine in which the defendant rained invective on two village employees, wished them and their family ill health, and complained of their job performance as well as the tickets that she had received. *Mangano*, 570. The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. *Mangano* 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action. Indeed, the conduct in *Mangano* was arguably closer than plaintiff's to the realm of unprotected threats because it was repeated, directed at specific persons and wished them harm. And *Mangano* is in

372

line with well-settled Supreme Court and Second Circuit precedents cited above to the effect that only fighting words and true threats, rather than crude or offensive critiques of government can be penalized. See for example, *Texas v. Johnson*, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 where the Court described flag burning as a generalized expression of dissatisfaction with the policies of the federal government rather than a direct personal insult or invitation to exchange fisticuffs; *Cohen*, 403 U.S. at 16, 20, 91 S.Ct. 1780 where the court said wearing a jacket saying "fuck the draft" did not amount to fighting words; and *Posr*, 180 F.3d at 415 where "one day you're going to get yours" was held not to amount to fighting words. That the court clerks who received plaintiff's message was apparently alarmed by it does not alter the analysis. Whether a right is clearly established is assessed in light of the legal rules that were clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 244, 129 S.Ct. 808, 172 L.Ed.2d 565. And under the applicable case law, plaintiff's message could not have been considered fighting words or true threats.

Accordingly, plaintiff's right not to be arrested for the message at issue was clearly established.

██ Nonetheless I find that D'Agata and Gorr are entitled to qualified immunity because under the circumstances here their actions were objectively reasonable. D'Agata and Gorr executed the arrest after D'Agata was instructed to draft a charge by an assistant district attorney who had in turn been ordered to do so by the District Attorney which D'Agata knew. See D'Agata's deposition at page 12 and his affidavit at paragraph 11. Plaintiff argues that this fact cannot be considered in the qualified immunity analysis and points out that the Second Circuit stated in

*In Re County of Erie*, 546 F.3d 222, 229 that because whether a right is clearly established is determined by case law, reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity. But I am persuaded by the analysis in *McChesney v. Bastien*, 2013 WL 4504459 at pages 7 to 8, Northern District of New York, August 22, 2013 which I incorporate here without repeating, that phrase, considered in context, does not mean what it sounds like, and that advice of counsel remains relevant to the objective reasonableness analysis. Further, the Second Circuit has stated more recently that at the very least the solicitation of legal advice informs the reasonableness inquiry. *Taravella*, 599 F.3d at 135, note 3. So I find I can consider it. That D'Agata was instructed by Zangla to draft the charge, Zangla believed there was probable cause for the charge, and Zangla reviewed and approved the charge before it was filed renders the officers' actions objectively reasonable. See *Amore* 624 F.3d at 535 granting qualified immunity where the defendant acted deliberately and rationally in seeking to determine the then valid applicable and enforceable law before arresting plaintiff even though the statute was held unconstitutional by the New York Court of Appeals 18 years earlier; *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255–56, Third Circuit 2010, where the court said that a police officer who relies in good faith on a prosecutor's legal opinion that an arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause; *Kijonka v. Seitzinger*, 363 F.3d 645, 648, Second Circuit 2004 where the court said that consulting a prosecutor goes far to establish qualified immunity; *Muhammad v. City of Peekskill*, 2008 WL 4525367 at page 7, where the court said normally it is reasonable for law enforcement officers to

rely on a prosecutor's advice in bringing charges; *Strawn v. Holohan*, 2008 WL 65586 at page 6, January 4, 2008 where the court said the fact that the officer consulted with the DA's Office before the arrest while not dispositive of the issue is a factor supporting the reasonableness of the officer's actions.

In these circumstances, where Zangla prompted D'Agata to draft the charge, Zangla let D'Agata know that he and his boss approved of it and Zangla reviewed and approved the instrument before it was filed, the officers could hardly be expected to refuse the ADA's request or instructions. See *Davis v. Scherer*, 468 U.S. 183, 196, note 13, 104 S.Ct. 3012, 82 L.Ed.2d 139 where the court said it is unfair and impracticable to hold public officials generally to the standard of trained lawyers; *Amore*, 624 F.3d at 534 where the court said police officers are not expected to be lawyers or prosecutors; cf. *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998) where the court said the question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in defendant's position should know about the constitutionality of the conduct. Moreover, the cases on which plaintiff relies to argue that there is no advice of counsel defense, which appear at pages 6 and 7 of plaintiff's reply brief are distinguishable because none involved an arrest initiated by an ADA who then dragoons officers into executing it. See *Lawrence v. Reed*, 406 F.3d 1224, 1231, Tenth Circuit 2005; and *O'Rourke v. Hayes*, 378 F.3d 1201, 1210. It is one thing for an officer to make an arrest after getting advice in a case he initiated. And in that scenario the officer is still likely although not automatically entitled to qualified immunity because we want officers to seek legal advice to prevent improper arrests. See *Kijonka*, 363 F.3d at 648. It is another thing however to expect an officer to refuse to proceed with a case that an ADA initiates. Denying qualified immunity here would mean that we would expect every cop asked to make an arrest in this situation by an ADA to refuse, which cannot be the case. See *Dale v. Kelley*, 908 F.Supp. 125, 138, Western District of New York, 1995; affirmed, 95 F.3d 2, where the district court said as a practical matter, police officers must be able to rely on the advice of prosecutors; the judicial system depends on this reliance.

Further, Judge Rourke informing plaintiff that he would be arrested also supports the officer's claim for qualified immunity. It would not be reasonable to expect officers to know that an action seemingly endorsed by the District Attorney, assistant district attorneys, and a judge was not proper. Nor would it be reasonable to expect the officers to distinguish between Mangano, which involved crude criticism of government to government, and cases like Dimuzio, where the crude statements were made to a civilian, especially in light of the ADA's instructions. Accordingly, D'Agata and Gorr are entitled to qualified immunity.

 Now turning to ADA Zangla. He argues he's entitled to summary judgment and dismissal of the claims against him on the basis of absolute prosecutorial immunity which protects prosecutors from civil suits arising from activities intimately associated with the judicial phrase of the criminal process. *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128. The essential purpose of absolute immunity is to insulate from judicial scrutiny the motives and reasonableness of a prosecutor's official act. *Robison v. Via*, 821 F.2d 913, 918. In determining whether absolute immunity protects a prosecutor's conduct from civil suits, courts look to the nature of the function performed rath-

er than the identity of the performer. See *Kalina v. Fletcher*, 522 U.S. 118, 127, 118 S.Ct. 502, 139 L.Ed.2d 471. A wide range of a prosecutor's conduct is protected by absolute immunity. The Second Circuit has interpreted that definition to include all conduct closely associated with the judicial process which is part of the prosecutor's traditional role as an advocate for the state. *Belot v. Wieshaupt*, 1997 WL 218449 at page 5. A district attorney is not only absolutely immune from civil liability for initiating a prosecution and presenting the case at trial, but also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged. *Hill v. City of New York*, 45 F.3d 653, 661.

A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, however, are not entitled to absolute immunity, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209. When a prosecutor performs the investigative functions normally performed by a detective or a police officer, *Buckley*, at 273, 113 S.Ct. 2606, such as giving police legal advice on the propriety of investigative techniques or on whether or not probable cause exists to make an arrest, *McCray v. City of New York*, 2007 WL 4352748 at page 15, he or she is entitled only to the protection of qualified immunity. See *Bernard v. County of Suffolk*, 356 F.3d 495, 502. Plaintiff argues that Zangla is not entitled to absolute immunity because he ordered plaintiff's arrest which is a police function. Whether a prosecutor involved in an arrest is entitled to absolute immunity depends on the prosecutor's role in the arrest. See *Murphy v. Senior Investigator Neuberger*,

1996 WL 442797 at page 10, denying absolute immunity where due to an undeveloped factual record, the court cannot determine precisely what the prosecutor's role in the arrest was. A prosecutor's participation in the execution of an arrest is not protected by absolute immunity. *Day v. Morgenthau*, 909 F.2d 75, 77–78. See *Hickey v. City of New York*, 2002 WL 1974058 at page 3.

A prosecutor's communication to police officers of his decision as to precisely what charges he would lodge against an individual, however, is protected by absolute immunity. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 531. The Second Circuit has thus recognized a meaningful distinction between filing a criminal information and procuring an arrest warrant on the one hand and executing the arrest warrant on the other. *Barr v. Abrams*, 810 F.2d 358, 362.

Zangla is entitled to absolute immunity for his decision to charge plaintiff. See *Hill*, 45 F.3d at 661. But if he ordered a warrantless arrest of plaintiff as opposed to say a desk appearance ticket, which would not have entailed an arrest, he is not absolutely immunity for that decision. Zangla failed to respond to plaintiff's properly supported Local Rule 56.1 statements which states in paragraph 26: Zangla directed D'Agata to charge and arrest plaintiff for aggravated harassment. Because Zangla failed to respond to a properly supported statement, the statement is admitted for purposes of plaintiff's motion. See Federal Rule of Civil Procedure 56(e)(2) and *Giannullo v. City of New York*, 322 F.3d 139, 140.

Further, Zangla does not even argue the objective reasonableness of his actions, relying only on his subjective intent, which is irrelevant. See Zangala's opposition brief at page 10 and *Amore*, 624 F.3d at 535.

Finally, that Zangla ordered the arrest is amply supported in the record. See D'Agata's deposition at pages 34 to 35 where he says the ADA instructed me to do it and I did it; Zangala's deposition at page 43 where D'Agata testified that when Zangla instructed him to draw up the information, Zangla also said that he is in court today and we're going to arrest him; and D'Agata's affidavit in paragraph 11 which said that Zangla advised D'Agata that at the time of the calendar call, D'Agata was to arrest the plaintiff after he was charged; also see Zangala's reply declaration, paragraph 11, where he points out that a criminal prosecution can be initiated by appearance tickets issued by law enforcement officer or by an arrest; Zangala's deposition at page 65, where Zangla says an decision to file an accusatory instrument and an arrest go hand in hand; Zangala's deposition at 28 to 30 where he testifies he planned to have plaintiff arrested when he showed up for court and he would have discussed that with Judge Rourke in advance; and Judge Rourke's deposition at pages 59 to 60 where he testified he understood in advance that the plaintiff was going to be charged and believed that Zangla also determined that the plaintiff would be arrested. Accordingly, while Zangla is entitled to absolute immunity for the decision to charge plaintiff, he has not shown that he is entitled to absolute immunity for the decision to arrest plaintiff. And plaintiff has shown that he is not.

So plaintiff's motion is granted and Zangala's motion is denied on the issue of absolute immunity for the decision to arrest plaintiff.

I now turn to qualified immunity. I also find that Zangla is not entitled to qualified immunity for instructing D'Agata to make the arrest. For the same reasons I've already discussed, plaintiff's arrest vi-olated his clearly established constitutional right to engage in and be free from arrests because of protected speech. Zangla argues that he did not believe there was a constitutional bar to charging plaintiff with a crime, his reply at page 10. I don't quite see how one can at once believe that the First Amendment could be raised as a defense to the charge and at the same time be unaware of any constitutional impediments to bringing the charge. It almost sounds like Zangla and Farrell knew the arrest was unconstitutional but were willing to go forward and wait and see if plaintiff would realize it. I'm not sure that's what Zangla means, I hope not. But in any event I may not consider an official's subjective intent in determining whether he is entitled to qualified immunity, that's *Amore*, at 535.

I also note that Zangla has directed the Court to *Heien v. North Carolina*, —— U.S. ——, 135 S.Ct. 530, 190 L.Ed.2d 475. He brought that to my attention in docket entry 68. That court held that a reasonable mistake of law can support reasonable suspicion to initiate the traffic stop, 135 S.Ct. at 534, 540. Heien is distinguishable not only because it is not a qualified immunity case and reasonable mistakes of law have been recognized as excusable in the qualified immunity context long before Heien, see *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272, but because Zangala's mistake was not reasonable. In that respect, Zangala's qualified immunity claim differs from D'Agata's and Gorr's. The precedent distinguishing police officers from lawyers, which helps the officers, hurts Zangla. If cops are not expected to know what a lawyer would learn or intuit from researching case law, *Amore*, at 533–34, an assistant district attorney certainly is. And there surely is nothing unfair or impracticable about holding a trained lawyer to the standard of

trained lawyer. While it is reasonable for a police officer to rely in certain circumstances on the legal advice of a prosecutor, the prosecutor himself must be held to the standard of a trained lawyer. See *Kijonka* 363 F.3d at 648 which denied qualified immunity to a prosecutor because no prosecutor, a law-trained specialist in the enforcement of the criminal law, could reasonably believe that the defendant had committed a crime while granting qualified immunity to an officer who consulted and was instructed to arrest by the prosecutor. See also *Davis v. Scherer*, 468 U.S. at 196 note 13, 104 S.Ct. 3012. As the Supreme Court stated in the *Connick v. Thompson* case, 563 U.S. 51, 131 S.Ct. 1350, 1361–62, 179 L.Ed.2d 417, legal training is what differentiates attorneys from average public employees. Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. Before they may enter the profession and receive a law license, all attorneys must graduate from law school or pass a substantive examination. Attorneys in the vast majority of jurisdictions must do both. These threshold requirements are designed to insure that all new attorneys have learned how to find, understand and apply legal rules. Nor does professional training end at graduation. Most jurisdictions require attorneys to satisfy continuing education requirements. That's also from the *Connick* case.

For these reasons, Zangla is not saved by his getting approval from the District Attorney in the way that the officers are saved by complying and getting approval from an assistant district attorney. See *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 where the court said officers cannot rely on the orders of a superior if there is a reason why any of them should question the validity of that order. Zangala's actions are even less reasonable given that

he had the time to do the relatively simple legal research but did not.

Accordingly, Zangla is not entitled to qualified immunity, Zangala's motion for summary judgment is denied, and plaintiff's motion for summary judgment as to liability is granted as to Zangla.

■ Turning now to municipal liability. Congress did not intend municipalities to be held liable under Section 1983 unless action pursuant to official municipal policy of some nature caused a constitutional tort. That's *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. Thus, to prevail on a claim against a municipality under Section 1983 based on acts of a public official, a plaintiff is required to prove actions taken under color of law, deprivation of a constitutional or statutory right, causation, damages, and that an official policy of a municipality caused a constitutional injury. *Roe v. City of Waterbury*, 542 F.3d 31, 36.

■ As discussed above, I find that plaintiff suffered a deprivation of his First Amendment rights when he was arrested under color of law. The parties' argument focus on the fifth and third elements to which I now turn. I'm going to take the fifth element first which is whether a policy of the municipality caused the injury. That element reflects the notion that a municipality may not be held liable under Section 1983 solely because it employs a tort feasor. *In Re Dayton* 2011 WL 2020240 at page 8. There must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412. An act performed pursuant to a custom that has not been formally approved by an appropriate decision-maker may fairly subject a municipality to liability on the theory that the relevant practice is so

widespread as to have the force of law. *Board of County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626. Monell's reach, therefore, goes beyond unconstitutional policies that have been formally endorsed by the municipality and includes instances in which a municipality's knowledge of and support for its officers' unconstitutional conduct can be inferred from its failure to curtail that conduct. *MacIssac v. Town of Poughkeepsie*, 770 F.Supp.2d 587, 597. See *Dorsett–Felicelli v. County of Clinton*, 371 F.Supp.2d 183, 194. In *City of Canton* the Supreme Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training. *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 129. Failure to train, however, is a narrow basis of liability, and any municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train. *Connick*, 131 S.Ct. at 1359. See *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23, 105 S.Ct. 2427, 85 L.Ed.2d 791. To satisfy the statute, a municipality's failure to train its employees in any relevant respect must amount to deliberate indifference to the rights of the persons with whom the untrained employees come into contact. *City of Canton*, at 388, 109 S.Ct. 1197. Only then can such a shortcoming be properly thought of as a city policy or custom actionable under Section 1983. *Canton*, at 389, 109 S.Ct. 1197; see *Connick*, at 1359–60 where the court said deliberate indifference is a stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action. And see *Brown*, 520 U.S. at 410, 117 S.Ct. 1382 and *Cash v. County of Erie*, 2011 WL 3625093 at page 7 Second Circuit August 18, 2011. Thus, when city policy-makers on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policy-makers choose to retain that program. *Brown*, 520 U.S. at 407, 117 S.Ct. 1382. The city's policy of inaction in light of notice that its program will cause constitutional violations is a functional equivalent of a decision by the city itself to violate the Constitution. That's Justice O'Connor's decision in *Canton*, confirming in part and dissenting in part, at page 395, 109 S.Ct. 1197.

A pattern of similar constitutional violations by untrained employees is ordinarily necessary to determine deliberate indifference for purposes of failure to train. *Connick*, at 1360. Policy-makers continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard of the consequences of their actions, the deliberate indifference to necessary to trigger municipality liability. *Bryan County*, 520 U.S. at 407, 117 S.Ct. 1382. Without notice that a course of training is deficient in any particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. See *Connick*, at 1360.

There's no dispute that the village did not provide training of any kind to its officers on First Amendment issues. I find, however, that there is a fact issue on the existence of a pattern of similar constitutional violations sufficient to put the village on notice of the need for training with respect to 240.30(1). It's undisputed that the village was not on notice of any judicial determinations that the conduct of its police officers violated the First Amendment.

Plaintiff has, however, provided nine criminal informations from 2007 through 2010—although some of the dates are redacted so I'm not sure they all fall in that window—accusing people other than plaintiff of violating that same section for reasons that plaintiff argues are unconstitutional. They're Exhibit 16 to Mr. Bergstein's affidavit. While the degree of threatening language found in these informations varies, a jury could conclude that at least some of them reflect an unconstitutional basis for arrest under 240.30(1) similar to plaintiff.

For example, looking at those exhibits, at page 1, the information charged someone with, the defendant with calling someone a slut and saying go fuck yourself. The second one involved repeatedly stating fuck you and bitch. The third one is talking about sexual acts on a police department phone line. The fourth is about someone saying I'm going to run you and your tow trucks off the road, see how much that will cost you. The fifth is threatening to kill someone's dog. The sixth is saying you betterer watch your ass in town. The seventh is a threaten to wash you up. The eighth is the statement if I can't have you then no one can have you. And the ninth is calling someone a punk ass motherfucker. I can't say that these statements constitute a pattern of constitutional violations as a matter of law, because (a) they don't reflect that arrests were actually made and (b) even if they did there may have been circumstances of the arrest not reflected in the information. And it is a jury question whether they are frequent enough to amount to a custom. On the other hand, I don't say that no rational juror could be persuaded by them. The plaintiff also attaches criminal informations accusing people of violating 240.20(3), the disorderly conduct statute. Those are Exhibit 17 to Mr. Bergstein's affidavit. They can also be used to support the idea that the village had a custom of arresting people for foul language in the absence of a legitimate threat.

■ I also find plaintiff can proceed at trial on a single incident theory of liability. Under Canton and Connick, in a narrow range of circumstances a plaintiff need not show a history or pattern of prior violations because the need for more or different training is patently obvious. *Connick,* at 1360–61. Contrary to defendant's argument, this remains good law after Connick. See *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 391. To succeed on this theory, plaintiff must show that a policy-maker knows to a moral certainty that its employees will confront a certain situation, that the situation presents the employee with a difficult choice of the type training will make less difficult, and that violation of constitutional rights is a highly predictable consequence of the failure to train. *Walker v. City of New York,* 974 F.2d 293, 297; *Connick,* at 1361; see *Chamberlain,* 986 F.Supp.2d at 391. There's evidence the village knew its officers would confront situations similar to plaintiff's. Police Chief Kinne testified that arrests under the same statute were common, and D'Agata testified that it was a pretty common charge for patrol officers though he said it was not one of his most common charges. The village also made some 62 arrests under the statute between 2003 and 2012. Given that the statute in force at the time of plaintiff's arrest authorized unconstitutional arrests the jury could, but would not be required, to find that this evidence shows to a moral certainty on the part of the village that officers would confront situations like plaintiff's. Also, given that the statute authorized unlawful arrests, a jury could conclude that constitutional violations were a highly predictable consequences of the village's fail-

ure to train, but because police officers receive some training on First Amendment at the Police Academy and because D'Agata and Gorr submit in their affidavits that a result of their Police Academy training they knew that a citizen could not be criminally charged for engaging in speech that is merely alarming or annoying or which criticizes the government, even if crude and profane, a jury would not be required to so conclude.

There is also a fact issue as to causation. In analyzing a Monell claim rigorous standards of culpability and causation must be applied to insure that the municipality is not held liable solely for the actions of its employee. *That's Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382. Plaintiff must identify a specific deficiency in the village's training program and establish that deficiency is closely related to the ultimate injury such that it actually caused the constitutional deprivation. *Amnesty America*, 361 F.3d at 129. In other words, plaintiffs must demonstrate that the employee's shortcomings resulted from a faulty training program rather than from other unrelated circumstances. That's *Amnesty America*, at 129–30. The relevant inquiry is thus would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect. *Canton*, at 391, 109 S.Ct. 1197.

The village and the plaintiff agree that Zangla directed D'Agata to make the arrest. There is thus a strong argument that plaintiff's arrest was caused by Zangala's direction and not the village's policy. By the way, that agreement can be found in paragraphs 26 of the respective 56.1 statements. So if we assume that Zangla directed D'Agata to make the arrest, there is a good argument that the arrest was caused by Zangla and not by the village's policy.

But I cannot find lack of causation as a matter of law in these circumstances. In a situation where an officer blindly follows the prosecutor's instructions with no opportunity to reflect on or analyze it, I suspect that as a matter of law causation cannot exist. But given that D'Agata knew the basis of the charge, the text of the statute and, as he asserts in his affidavit, that crude or offensive language could not be criminalized, or language which criticizes the government could not be criminalized even if crude or profane, and that he sat for a period of time after the initial instruction drafting the charge and reviewed it with Zangla before filing it, I can't rule out the possibility that a rational juror might conclude that a properly trained officer would have rejected Zangala's request or at least opened a dialogue that might have avoided plaintiff's arrest. See *Back v. Hastings–on–Hudson Union Free School District*, 365 F.3d 107, 126 where the evidence was insufficient to find as a matter of law that an intervening cause was sufficient to break the chain of causation. Although I find it most unlikely based on the evidence before me, I cannot make the causation determination as a matter of law given my obligation at this stage to construe the facts in plaintiff's favor.

So in conclusion, and for the foregoing reasons, the village defendant's motion is granted as to D'Agata and Gorr and denied as to the village.

Zangala's motion is denied.

Plaintiff's motion is denied as to D'Agata, Gorr and the village but granted as to Zangla.

Plaintiff's Monell claim will proceed to trial where I assume the issues will be the existence of a pattern of similar violations, the obviousness of the risk of violations under a single incident theory, and wheth-

er the village's failure to train caused plaintiff's arrest. And the trial will also determine the damages, if any, on plaintiff's claim against Zangla.